**HIGHFIELDS CAPITAL MANAGEMENT L.P.,**
Plaintiff,

v.

**John DOE, Defendant**

**No. C04–00176MISC MMC WD.**

United States District Court,
N.D. California.

Jan. 18, 2005.

---

Neil A. Smith, Howard Rice Nemerovski Canady Falk & Rab, San Francisco, CA, for Plaintiff.

Eric J. Sinrod, Lina M. Brenner, Duane Morris LLP, San Francisco, CA, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO QUASH SUBPOENA; DENYING MOTION TO STRIKE OBJECTION; VACATING HEARING**

CHESNEY, District Judge.

Before the Court is plaintiff Highfields Capital Management L.P.'s objection to and motion for de novo review of Magistrate Judge Wayne D. Brazil's Report and Recommendation ("Report"), filed October 28, 2004, in which Magistrate Judge Brazil recommends that the Court grant defendant John Doe's motion, filed pursuant to Rule 45(c)(3)(A) of the Federal Rules of Civil Procedure, to quash the subpoena plaintiff served on non-party Yahoo!. Defendant has filed opposition to plaintiff's objection, and included therein a motion to strike the objection on grounds of untimeliness, to which plaintiff has filed a reply.

Having considered the Report, the papers filed in support of and in opposition to the objection and motion for de novo review, and the papers filed in support of and in opposition to defendant's motion to quash, the Court deems the matter suitable for decision on the papers, VACATES the hearing scheduled for January 21, 2005, and rules as follows:

1. The deadline to file an objection to the Report is ten court days after October 28, 2004, the date of service of the Report, see Fed.R.Civ.P. 6(a), 72(b), i.e., November 11, 2004, to which date three days are added to account for the service of the Report by mail, see Fed.R.Civ.P. 6(e), thus extending the deadline to November 14, 2004, to which date, because November 14, 2004 was a Sunday, one court day is added, see Fed.R.Civ.P. 6(a), thus extending the deadline to November 15, 2004. Because plaintiff filed its objection on November 15, 2004, the objection is timely. Accordingly, defendant's motion to strike the objection is DENIED.

2. Contrary to plaintiff's argument, Magistrate Judge Brazil did not err by requiring plaintiff to show, with respect to its claims against defendant,[1] that "there is a real evidentiary basis for believing that the defendant has engaged in wrongful conduct that has caused real harm to the interests of the plaintiff." (See Report at 7:25—8:2.) Indeed, the case upon which plaintiff primarily relies, as well as the case on which the Magistrate Judge primarily relies, both require such a showing. See Sony Music Entertainment Inc. v. Does 1–40, 326 F.Supp.2d 556, 564–65 (S.D.N.Y.2004) (holding plaintiff must make "concrete showing of a prima facie claim of actionable harm"; denying motion to quash subpoena to undercover identity of doe defendants where, inter alia, plaintiff offered sufficient evidence to show it could establish prima facie claim); Columbia Ins. Co. v. Seescandy.com, 185 F.R.D. 573, 580 (N.D.Cal. 1999) (holding "plaintiff must make some showing that an act giving rise to civil

---

1. Plaintiff's complaint against defendant is pending before the United States District Court for the District of Massachusetts, High-fields Capital Management L.P. v. Doe, Civil Action No. 04–11684. (See Def.'s Req. for Judicial Notice, filed August 17, 2004, Ex. A.)

liability actually occurred"; finding plaintiff entitled to conduct discovery to learn identity of defendant where plaintiff offered evidence "sufficient to demonstrate [defendants] committed an unlawful act").

■ 3. The Court, having reviewed the file de novo, adopts Magistrate Judge Brazil's recommendation and, accordingly, finds that plaintiff has failed to make a sufficient showing that defendant has engaged in wrongful conduct causing harm to plaintiff.

The context in which the statements were made plainly indicates the statements were, as Magistrate Judge Brazil aptly put it, "sardonic commentary." (*See* Report at 6:23.) Read literally, the statements suggest that plaintiff and plaintiff's "investor friends" have benefited from recent fluctuations in the price of the stock. Given that the price previously had dropped precipitously, that the recent increase was minuscule, and that the stock actually again decreased in value immediately thereafter, it is obvious that the speaker is advancing, by sarcasm, the opinion that plaintiff is not knowledgeable enough to put its clients and/or itself into favorable investments. In short, plaintiff has failed to demonstrate that a reasonable person perusing the message board at issue would understand the statements as having been made by plaintiff itself, which is plaintiff's theory in support of its defamation and commercial disparagement claims, or as statements made in connection with commercial services being offered by defendant, which is plaintiff's theory in support of its claims sounding in trademark.[2]

4. Alternatively, because defendant's motion to quash the subpoena could be characterized as a non-dispositive motion, the Court has also reviewed the Report as a non-dispositive order under the "clearly erroneous or contrary to law" standard. *See* 28 U.S.C. § 636(b)(1)(A). Although resolution of the motion will conclude the miscellaneous proceeding in this district, plaintiff's complaint against defendant will remain pending before the District of Massachusetts, irrespective of resolution of the miscellaneous proceeding. *See, e.g., Channelmark Corp. v. Destination Products Int'l, Inc.,* 2000 WL 968818 (N.D.Ill.2000) (holding motion to enforce subpoena filed in district court where plaintiff served subpoena was nondispositive, because resolution thereof would not dispose of complaint pending in other district court).[3] Having reviewed the file, the Court concludes that Magistrate Judge Brazil's order is neither clearly erroneous nor contrary to law.

## CONCLUSION

For the reasons expressed, defendant's motion to quash the subpoena is hereby GRANTED.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION RE DEFENDANT'S MOTION TO QUASH

BRAZIL, United States Magistrate Judge.

## I.

## PROCEDURAL SETTING

This Report and Recommendation addresses a motion to quash a subpoena.

2. The Court further agrees with, and thus adopts, Magistrate Judge Brazil's findings that plaintiff has not made a sufficient showing it has been harmed by the statements and that, with respect to its breach of contract claim, plaintiff has failed to show it can establish the parties to the Yahoo! service agreement, *i.e.,* Yahoo! and defendant, intended that plaintiff benefit from that agreement.

3. The fact that plaintiff suggests it may dismiss its complaint if this Court grants the motion to quash does not serve to transform the motion into a dispositive motion.

The motion was filed on August 17, 2004, on behalf of "John Doe"—the unidentified defendant in a case filed by Highfields Capital L.P. ("Highfields") in the federal district court in Boston, Massachusetts. In that case, Highfields alleges that the unidentified defendant has invaded its rights under trademark and unfair competition laws by using the screen name "highfieldscapital" when posting three messages on an internet message board. *See,* Request for Judicial Notice in Support of Motion to Quash Subpoena to Yahoo! Inc., filed August 17, 2004, Ex. A. Not knowing the identity of the person or persons responsible for the three postings, Highfields caused a subpoena to issue to Yahoo! Inc., a subpoena that calls upon Yahoo! to disclose considerable information about the "user(s) registered under the user names 'highfieldscapital' and 'ipump2004.' "[1]

Defendant filed his or her[2] motion to quash in this court because the subpoena was served in this district. After this dispute between the anonymous defendant and Highfields was referred for a report and recommendation by District Judge Chesney, I conducted a hearing and invited a follow-up written submission, which Highfields filed on October 5, 2004.

For the reasons set forth below, I RECOMMEND that the District Court GRANT THE MOTION TO QUASH the subpoena.

## II.

## FACTS

Under the legal norms on which plaintiff bases the claims it has filed in Massachusetts, to reason reliably about the parties' respective rights courts must focus on the specific factual circumstances in which the challenged conduct occurred. With this admonition in mind, we begin by identifying the facts that the law makes most relevant to ruling on the motion to quash. To the best of our knowledge, the facts set forth in this section are not disputed.

Silicon Graphics, Inc. (SGI) is a publicly traded corporation. Highfields Capital Management LP manages domestic and offshore hedge funds with assets under management totaling several billion dollars. At the time Highfields filed its complaint in Massachusetts it was SGI's largest shareholder, controlling some 5.22% of SGI's outstanding shares.

Yahoo! Inc. provides a wide range of high visibility internet services. One of the thousands of message boards set up by Yahoo! Inc. is for Silicon Graphics, Inc. (SGI). Yahoo! requires members who use this message board to enter a Service Agreement that permits a user to adopt a screen name that bears no relation to his true identity and that contains limited protections against disclosure of his true name and his contact information. Near the bottom of the message board Yahoo! publishes a "Reminder" that states that "This

---

1. The subpoena is very broad. If the district court declines to accept the Recommendation hereby submitted, the undersigned suggests that the court reduce, considerably, the scope of the subpoena. Highfields has offered no justification for acquiring information about the user registered under the name "ipump2004." Nor has Highfields offered any justification for acquiring the users' profiles, their phone numbers, "all" of their credit card information, or "all" of the documents exchanged between Yahoo! and the users (including all documents related to any complaints against or alleged abuses by the users).

2. While we do not know defendant's gender, we will proceed on the assumption that defendant is a male because defense counsel refers to her client as "he" and as "John" Doe (not "Jane" Doe). *E.g.,* Declaration of Lina M. Brenner in Support of Motion to Quash Subpoena to Yahoo! Inc., filed August 17, 2004, ¶ 3.

board is not connected with the company. These messages are only the opinion of the poster, are no substitute for your own research, and should not be relied upon for trading or any other purpose. Never assume that you are anonymous and cannot be identified by your posts."

Upwards of 200,000 messages have been posted on this board since 1997. The content, character, and quality of these messages covers a huge range. Many of the messages are crude, indecent, or transparently laughable—and many appear to have nothing whatsoever to do with SGI. Many of the postings include misspellings, grammatical errors, and/or incomplete thoughts and sentences. Many of the posters use screen names that would suggest, if taken seriously, some connection with SGI.[3] Many postings imply (by content and/or screen name) that the author has some access to inside information or some unique ability to foretell the future performance of the company. Many of the postings purport to predict the price path of SGI stock. Messages on this board reflect considerable venting, much tongue-in-cheek, little pretense at sophistication or thoughtfulness, and an ample and obvious sense of irreverence.

The lawsuit that plaintiff filed in the federal district court in Massachusetts is based entirely on three postings on the SGI message board. The screen name to which these postings are attributed is "highfieldscapital." The three postings, in their entirety, are:

1. On July 21, 2004, at 7:18 a.m. (Eastern Standard Time):

"It appears that this will be a very fine day."

2. On July 21, 2004, at 7:16 p.m. (Eastern Standard Time):

"We trust our retail investor friends have taken advantage of this quarter's SGI pre-earnings rally, which occurred this morning. It's just Highfields' way of sharing important information with our smaller, yet still highly valued, partners in the exciting story of Silicon Graphics. While it's always impossible to be specific, it might be expected that the stock has now returned to its typical trading range."

3. On July 27, 2004, at an undisclosed time:

"We're going to buy a new corporate jet ... a Gulfstream IV.[4] It will have custom zebrano wood trim and Corinthian leather seats with plasma TVs. Best of luck to our retail friends today and tomorrow!"

The price of SGI stock fluctuated wildly during the several years that preceded these postings, ranging between a high (at closing) of $12.56 per share in March of 2000 and a low of 32 cents in September of 2001. In February of 2004 the price per share of SGI stock had reached a high for the year at $3.80. On July 20, 2004, the afternoon before defendant posted the first of these three challenged messages, SGI stock closed at $1.82 per share. It was before the markets opened the next morning, the 21st, that defendant's first message appeared on the SGI message board ("It appears that this will be a very fine day.") Later that morning, the price of SGI stock opened at $1.89 per share. At some point in the trading day the price reached $1.90 per share, but by the time the market closed on the 21st the price had fallen to $1.77.

---

**3.** Examples include: "sgi is high tech," "fantasy sgisland," "oldsgicust," "sgi_pump_n_dump," and "bob_bishop" [name of the chairman of SGI].

**4.** The elipse in this sentence appears in the original posting (as reproduced by plaintiff).

It was against this backdrop, after the markets had closed that day, that defendant's second message appeared—the self-crediting message in which "highfieldscapital" purported to express the hope that its "smaller" but "still highly valued" investor friends had taken advantage of "this quarter's SGI pre-earnings rally" and suggested that they could expect "the exciting story of Silicon Graphics" to continue "now [that the price had] returned to its typical trading range."

The price per share of SGI stock fell again the next day, July 22nd, closing at $1.75.

There is a similar disconnect between the price of SGI shares and the content of the third and final message on which plaintiff bases its complaint. Appearing on the message board on July 27, 2004, this posting purported to announce SGI's intention to purchase a fancy new "corporate jet" and wished "best of luck to our retail friends today and tomorrow." On July 26th, the day before this posting appeared, the price of SGI stock had closed at $1.80. By the close of trading on the 27th (the "today" referenced in the challenged message), the closing price had fallen to $1.65. On July 28th (the "tomorrow" in the message), SGI announced its quarterly earnings; the stock closed at $1.43.

Before turning to our discussion of the legal significance of the facts described in the preceding paragraphs we should identify several facts that we do not know. We do not know the identity of the person or persons who posted the challenged messages. We do not know how that person makes a living,[5] whether he or she owns or trades any stocks, whether he or she has any connection with SGI or with Highfields Capital or with any of their competitors. The messages invite no one to contact the person who posted them and make no reference to any service or product that person might sell. Nor are the messages accompanied by hyperlinks to other web sites—or by any encouragement to visit any other such sites.

## III.

## THE LEGAL CONTEXT: FUNDAMENTALS

In addressing the issues raised by the pending motion, we must keep clearly in mind the fundamental legal principles that shape and direct the applicable analysis.

As the precedents recognize,[6] the court's primary responsibility in a dispute like this is to strike an appropriate balance between competing interests and public policies. Our first task is to identify what those interests and policies are in the specific setting of this dispute. Thereafter, we must make judgments about how much harm, if any, each of the proposed competing resolutions of this dispute would do to the implicated interests or public policies.

While plaintiff seems to suggest otherwise, the interests and policies invoked by the defendant are of considerable potential significance. Indeed, they are rooted in the First Amendment to the Constitution of the United States. What defendant seeks to protect through his motion to quash is the right to express most effec-

---

5. Defense counsel suggests that defendant is an "industrial designer," but that assertion has not been verified and is not supported by competent evidence. See, Declaration of Lina M. Brenner in Support of Reply, filed September 15, 2004, ¶ 2.

6. The two cases on which we rely most heavily are *Dendrite International. Inc. v. Doe*, 342 N.J.Super. 134, 775 A.2d 756 (2001); and *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573 (N.D.Cal.1999). *See also, Rocker Mgmt. LLC v. John Does 1 Through 20*, 2003 WL 22149380, 2003 U.S. Dist. LEXIS 16277 (N.D.Cal. May 28, 2003).

tively and anonymously, without fear of expensive adverse consequences, his views about matters in which many other members of the public are interested.[7] In this case, those matters involve the performance and policies of a large, publicly traded corporation (SGI) and, perhaps less obviously, its largest single shareholder (Highfields Capital).

Viewed in context (the only relevant way to view communications), defendant's postings consist of sardonic commentary on a public corporation; through irony and parody, these bulletin board postings express dissatisfaction with the performance of the stock and the way company executives choose to spend company resources. They also can be interpreted as expressing disapproval or criticism of Highfields Capital—mocking its arrogance and condescension and suggesting that its high-priced investment advice is quite vulnerable to being both biased and wrong. These are views in which other members of the public may well be interested—and that defendant has a right to express anonymously.

The competing interests that plaintiff invokes are rooted in trademark laws (federal and state) and in plaintiff's right to protect itself from unfair competition and from tortious commercial disparagement. Most of the claims that plaintiff seeks to pursue in the federal court in Massachusetts sound, essentially, in plaintiff's interest in preventing competitive commercial exploitation of its property (name) and in protecting itself from unfair commercial abuse. These are, of course, completely legitimate interests. It is of some analytical moment, however, that the rights plaintiff seeks to defend are not as vulnerable or precarious as the rights defendant

seeks to protect—and not as close to the central societal values that animate our Constitution.

These differences in the interests and rights that are in tension when a private civil plaintiff seeks to discover the identity and address of an anonymous internet speaker inform the tests that courts have applied in this kind of setting. The precedents[8] persuade us that the appropriate test has two components, each essential.

The first of these components reflects the courts' recognition that enforcing this kind of subpoena always would invade at least in some measure rights that are fundamental and fragile—rights that the courts have a special duty to protect against unjustified invasion. Because of the importance and vulnerability of those rights, the center of the first component of the test is a requirement that the plaintiff persuade the court that there is a real evidentiary basis for believing that the defendant has engaged in wrongful conduct that has caused real harm to the interests of the plaintiff that the laws plaintiff has invoked were intended to protect.

It is not enough for a plaintiff simply to plead and pray. Allegation and speculation are insufficient. The standards that inform Rule 8 and Rule 12(b)(6) offer too little protection to the defendant's competing interests. Thus, the plaintiff must adduce *competent evidence*—and the evidence plaintiff adduces must address *all* of the inferences of fact that plaintiff would need to prove in order to prevail under at least one of the causes of action plaintiff asserts. In other words, the evidence that plaintiff adduces must, if unrebutted, tend

---

**7.** See, *Seescandy.com*, 185 F.R.D. at 578; *Dendrite*, 342 N.J.Super. at 141, 775 A.2d 756 (noting "well established" right to speak anonymously).

**8.** See footnote 6, above, especially the *Dendrite* opinion.

to support a finding of *each* fact that is essential to a given cause of action. The court may not enforce the subpoena if, under plaintiff's showing, any *essential* fact or finding lacks the requisite evidentiary support.

The court proceeds to the second component of the test if, but only if, the plaintiff makes an evidentiary showing sufficient to satisfy the court in the first component of the test. If reached, the second component of the test requires the court to assess and compare the magnitude of the harms that would be caused to the competing interests by a ruling in favor of plaintiff and by a ruling in favor of defendant. If, after such an assessment, the court concludes that enforcing the subpoena would cause relatively little harm to the defendant's First Amendment and privacy rights and that its issuance is necessary to enable plaintiff to protect against or remedy serious wrongs, the court would deny the motion to quash.

As explained below, we RECOMMEND that the District Court find that plaintiff has failed to make the evidentiary showings necessary to satisfy the first of the two components of the test. If the District Court agrees, there is no occasion to reach the second component of the test. Should the Court proceed to the second component of the test, we further RECOMMEND a finding that plaintiff has failed to persuade the Court that the conduct that plaintiff attributes to the defendant likely caused any real harm and, therefore, that the court is required to find that the balance tips in favor of GRANTING THE MOTION TO QUASH.

## IV.

## APPLYING THE RELEVANT LEGAL TESTS

### A.

### The Claims That Sound in Trademark, Trademark Dilution, and False Designation of Origin

The viability of plaintiff's claims that sound in trademark law (federal or state), or in the closely related theory of false designation of origin, turns primarily on plaintiff's ability to prove (1) that the challenged conduct and the harm suffered was "commercial" in nature and that (2) in context, the challenged conduct was likely to cause an actionable degree of confusion about the origin or sponsorship of the messages attributed to the defendant.[9] We RECOMMEND that the District Court find that plaintiff has failed to adduce sufficient evidence as to either of these crucial elements of these causes of action.

### 1. No "Commercial" or "Competitive" Nexus

Most fundamentally, plaintiff has adduced no evidence at all that the message board postings on which it bases its claims were "commercial" in character, were driven by some commercial or "competitive" purpose, that they delivered any commercial or competitive advantage to anyone, or that they were likely to cause any harm to any commercial or competitive interest of plaintiff's. Plaintiff has pointed to no evidence of any connection between the three messages and any offer to sell, or any attempt to advertise or promote, any product or service. The messages clearly have an anonymous author. They include no links to any other web sites. They inti-

---

**9.** *See,* 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1)(A); *Northern Light Technology v. Northern Lights Club,* 97 F.Supp.2d 96 (D.Ma. 2000) (common law claim for trademark infringement in MA uses same analysis as federal analysis under § 1114); Mass. Gen Laws ch.110B § 12.

mate nothing about how to find their author (in the real world) or that he might be receptive to business overtures from anyone for any purpose.

There is nothing in the messages themselves and the setting in which they were posted that would invite any such inferences. Whoever posted the messages offered readers no reason to believe (in context) that he had anything to sell. In real-world context, the messages of the first day certainly did nothing to persuade anyone that the defendant had access to reliable inside information about SGI or was an acute market analyst who should be pursued for further "tips." If anything, the messages, viewed against the backdrop of the stock's performance that day, would have actively discouraged anyone from taking the poster seriously as an investment counselor.

The second message, in particular, would disabuse even superficial readers of any notion that the author purported to be a serious and reliable source of information about SGI and its stock. In that second message, the author implicitly congratulated himself for predicting a substantial upturn in the price of the stock as a result of which that price had returned to its historically appropriate (appreciably higher) trading range. The price of the stock, of course, had fallen—and was far below even its near term higher trading ranges.

In short, we see no reason to infer that the author of the messages used—or was understood as using—the name "highfieldscapital" as a "source-identifier." [10] Nor is there any evidence that defendant used the name "highfieldscapital" to try to secure any kind of commercial benefit or competitive advantage. Instead, it is far more likely that if anyone paid any attention at all to these messages, they were

understood as sardonic commentary. The Lanham Act and its state law analogues were not intended to prevent sardonic commentary; at their center, they were intended to protect commercial interests against unfair competition in the market place of goods and services, not the market place of ideas and opinions.

## 2. No Likelihood of Confusion

We also RECOMMEND that the District Court find that plaintiff has failed to adduce evidence sufficient to make a prima facie showing that people in the relevant audience were likely to be confused about the source of these messages, *i.e.*, were likely to believe that they were sponsored by Highfields Capital Management L.P., or by some disgruntled employee of either that entity or SGI.

Plaintiff has pointed to no evidence of actual confusion. Instead, plaintiff seems to contend that the use of the name "highfieldscapital" is virtually sufficient to make a prima facie showing of likelihood of confusion. While it is clear that the name used by defendant was very similar to the mark registered to plaintiff as "HIGHFIELDS CAPITAL," and while there is reason to believe that the mark is strong (registered, fanciful), these factors are clearly outweighed by other considerations that must be taken into account (under First Circuit and Massachusetts law) in assessing the likelihood of confusion. *International Association of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Center*, 103 F.3d 196 (1st Cir.1996) (list of factors courts consider to assess likelihood of confusion).

To establish "likelihood of confusion" a plaintiff must show not merely that confusion (as to source or sponsorship) is possi-

---

**10.** *E.g., United We Stand America, Inc. v. United We Stand, America New York, Inc.,* 128 F.3d 86 (2nd Cir.1997) (use of mark unlawful where use was *not* commentary on its owner but as a source identifier).

ble, but that it is probable. *International Association of Machinists*, 103 F.3d at 200–201. And the authorities clearly establish that in making this determination it is essential to consider the context in which the allegedly infringing activity occurs.[11] The context here has three dimensions that undercut very substantially the risk that readers of defendant's three messages would believe that their source was plaintiff or one of its employees. The first "context" is the play between the content of the messages and the performance of SGI stock. As pointed out above, there is a total disconnect between what the messages might be read as suggesting and how the stock actually performed on the days to which the messages point. Thus, even if readers of the message posted early in the morning of July 21st might have wondered if plaintiff was the source of the first message, the parody (irony, sarcasm) that is so evident in the second message would dispel any such notion.

The second relevant context is the character of Highfields Capital itself. Plaintiff contends that many readers of the SGI message board know that Highfields Capital is the single largest investor in SGI and that there is considerable commentary (over time) on the SGI message board about Highfields' activities vis-a-vis this stock. The people who attend to what plaintiff thinks about and does with this stock might well be expected to know that plaintiff considers itself to be a very sophisticated institution with responsibility (federally regulated) for very large investments on behalf of resource-rich, sophisticated clients. Message boardreaders who

have some sense that plaintiff considers itself to be such a high end and sophisticated investor on behalf of demanding and knowledgeable clients are not likely to think that plaintiff decided to use the SGI message board at all—let alone decided to use it to send off-the-wall signals, illegally and gratuitously, to less sophisticated and less fortunate players in the SGI market. Why in the world would Highfields Capital take such a risk (with its regulators and with its tony investors)?

Nor were message board readers likely to think that the source of the messages was a disgruntled or misguided employee of plaintiff's with inside information.[12] This follows, primarily, from the disconnect between the content of the messages and the performance of the stock. Once the market closed on the day the first two messages appeared it would have been clear that the messages were not based on any reliable information—whether "inside" or not.

The final piece of the context puzzle is the character of the message board itself. There is so much obvious garbage in the messages that appear in this 'venue,' and there are so many 'impersonations' that are so obviously and intentionally bogus on this and similar message boards,[13] that it is highly unlikely that a reader of a message in this setting would approach it with anything but skepticism—as to both content and source. There is so much irreverence and jocularity in this venue, so much mockery, so much venting, so much indecency and play, that no even remotely rational investor would take messages posted here at face value or base invest-

---

**11.** *International Association of Machinists,* 103 F.3d 196 ("any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark").

**12.** It is not clear that plaintiff would have standing to sue defendant on the theory that readers of the messages might think they originated in a disgruntled employee of SGI.

**13.** For a detailed discussion of message board culture see *New York Stock Exchange, Inc., v. Gahary,* 196 F.Supp.2d 401 (S.D.N.Y.2002).

ment decisions on them. Similarly, no one who looks at a message board like this for more than five minutes is likely to assume that the author identifications are reliable.

Plaintiff emphasizes that the name defendant chose to use is virtually identical to plaintiff's registered mark. True. But the use of that name was necessary to effect the parody,[14] Moreover, it was the use of that name that made it so obvious that the messages were sardonic and not real.

For all the reasons set forth above, we RECOMMEND that the District Court find that plaintiff has failed to show that it has viable claims sounding in trademark (under federal or state common law), trademark dilution, or false designation of origin.

## B.

## Defamation

Some of the observations made in the preceding sections also undermine the viability of plaintiff's defamation claim. It is extremely unlikely, given all the pertinent contextual considerations, that readers of these messages would understand them to have been posted by plaintiff. Thus the statements cannot be condemned as falsehoods as to origin or author. Nor are we persuaded that the content of these statements is defamatory.[15] On their face, they are opaque or out of touch with reality, but contain no condemnation of plaintiff. In context, they are clearly sardonic opinion or parody, not to be taken seriously by anyone. There is no evidence that they damaged plaintiff in fact. Nor can we reliably assume damage (to plaintiff's rep-

utation, or to its business prospects, or to its income) from the context. Just the contrary: the context strongly suggests that the statements were not likely to be taken seriously by anyone, not likely even to come to the attention of the kinds of clients plaintiff courted, and not likely to be attributed in fact to Highfields by such clients or by anyone else.

## C.

## Commercial Disparagement

The claim for commercial disparagement is even more strained. Because it is quite unlikely that a reader would ascribe the messages to plaintiff, they contain no implicit falsehood as to origin. Nor do they contain any overt disparagement of any goods or services offered by plaintiff.[16] To find something negative (by indirection) about the services offered by Highfields in these messages requires the reader to make way too many inferences and way too many assumptions to support a cause of action under this theory. No tort of this kind is evident in the words themselves. And plaintiff has adduced no evidence that would support a finding that, despite appearances, the effect of the words in these messages, in context, was to tortiously disparage plaintiff's products or services. Nor has plaintiff pled or offered evidence to prove that the messages it attributes to defendant caused plaintiff to suffer special damages. Without special damages, there is no cause of action for commercial disparagement under Massachusetts law. *Bose Corp., v. Consumers Union of United States, Inc.*, 57 F.R.D. 528 (D.Mass.1973).

**14.** *NYSE*, 196 F.Supp.2d at 406 ("parody, in addition to *referencing the original*, simultaneously conveys the contradictory message 'that it is not the original.' ") emphasis added.

**15.** For the elements of a claim for defamation in Massachusetts see *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 782 N.E.2d 508 (2003),

and *Rathore v. Kelly*, 2002 WL 31082045 (Mass.Super. Sept. 10, 2002).

**16.** *Picker Int'l v. Leavitt*, 865 F.Supp. 951, 964 (D.Mass.1994) (commercial disparagement (also termed "injurious falsehood") is defined as a false statement that calls into question the quality of a firm's goods or services).

## D.

### Third Party Beneficiary of Contract

Plaintiff's contention that Yahoo! and defendant intended plaintiff to be a beneficiary of the standard Yahoo! service agreement is unsupported by any evidence, direct or circumstantial.[17] There is nothing in the language of the contract that even remotely suggests any such intention. Nor do the clear purposes of the agreement, or the circumstances in which it was executed, intimate any such intention. To attain standing as a third party beneficiary of a contract, a person must show *clearly* that when the parties executed their agreement they intended its execution to confer real benefits on that person. There is no reason to believe that plaintiff, or any class of entities of which plaintiff might be a part, ever penetrated the outermost spheres of contemplation of Yahoo! and defendant when they entered the service agreement by which plaintiff attempts to bootstrap its way into standing.

For the reasons set forth above, WE RECOMMEND THAT THE DISTRICT COURT RULE THAT PLAINTIFF HAS FAILED TO ADDUCE SUFFICIENT EVIDENCE OF THE VIABILITY OF ANY OF ITS SUBSTANTIVE CLAIMS TO JUSTIFY ENFORCEMENT OF THE SUBPOENA.

## V.

### BALANCING THE RELATIVE MAGNITUDE OF THE COMPETING INTERESTS

Should the recommendation just made be rejected, the District Court would proceed to the second stage of the analysis—the stage in which the court would balance the parties' competing interests to determine whether the extent of the harm to defendant's First Amendment and privacy interests could be justified by the magnitude of the contribution that enforcing the subpoena likely would make to the interests plaintiff seeks to advance through the litigation. Should the District Court reach this stage, we RECOMMEND that it conclude that the balance tips clearly in favor of defendant's interests—and thus in favor of GRANTING THE MOTION TO QUASH THE SUBPOENA.

We base this recommendation primarily on two findings. The first is that enforcing a subpoena in this kind of setting poses a real threat to chill protected comment on matters of interest to the public. Anonymity liberates. More to the present point, commentary is likely to attract considerably more attention when the commentator selects a screen name either that is famous (in the pertinent circles) or humorous or ironic. In other words, being able to use screen names that have some message-related resonance or cachet contributes to the First Amendment ends of enriching the substance of the speech and of getting the message to a wider audience.

A person like defendant has a real First Amendment interest in having his sardonic message reach as many people as possible—and being free to use a screen name of the kind he used here carries the promise that more people will attend to the substance of his views. But if the court were to enforce plaintiff's subpoena, the court would be enabling plaintiff to impose

---

**17.** With respect to this claim, Massachusetts follows the Restatement (Second) of Contracts. *See e.g., Miller v. Mooney*, 431 Mass. 57, 725 N.E.2d 545 (2000) *citing Rae v. Air-Speed Inc.*, 386 Mass. 187, 435 N.E.2d 628 (1982). In order to prevail on this claim plaintiff must demonstrate that it is an "intended beneficiary." *Miller*, 431 Mass. 57, 725 N.E.2d 545; Restatement (2d) of Contracts, § 302 (1981).

a considerable price on defendant's use of one of the vehicles for expressing his views that is most likely to result in those views reaching the intended audience. That "price" would include public exposure of plaintiff's identity and the financial and other burdens of defending against a multi-count lawsuit—perhaps in a remote jurisdiction. Very few would-be commentators are likely to be prepared to bear costs of this magnitude. So, when word gets out that the price tag of effective sardonic speech is this high, that speech likely will disappear.

What of the plaintiff's interests? There simply is no reason to believe, on the record made here, that the posting of these three messages poses any threat to any commercial interest of plaintiffs. There is no reason to believe that there is any risk that these messages will draw clients to plaintiff's competitors or will cause potential clients to pause before engaging plaintiff's services. Considered in context, there is essentially no chance that these messages would be attributed to Highfields Capital Management L.P., or that they would sully its reputation in any quarter that might matter to it. If the setting were different, if the messages were not so obviously out of sync with the real world, or if for some other reason the alleged 'impersonation' might be effective, the balancing process would be more difficult and might have a different outcome. But in the circumstances here presented, the scales tip decidedly in defendant's favor. It is for this reason that we RECOMMEND THAT THE DISTRICT COURT QUASH THE SUBPOENA.

IT IS SO REPORTED AND RECOMMENDED.

October 28, 2004.