**QUIXTAR INC., Plaintiff,**

v.

**SIGNATURE MANAGEMENT TEAM, LLC d/b/a Team, Defendant.**

**No. 3:07–CV–505–ECR–RAM.**

United States District Court, D. Nevada.

July 7, 2008.

Bradley L. Smith, James Cleland, and James R. Sobieraj, Brinks Hofer Gilson & Lione, Ann Arbor, MI; Brian Masternak and Edward J. Bardelli, Warner Norcross & Judd, Grand Rapids, MI; Cedric C. Chao, San Francisco, CA; Dominic P. Zanfardino, Chicago, IL; James M. Schurz and William L. Stern, Morrison & Foerster, San Francisco, CA; John J. Frankovich and Miranda M. Du, McDonald Carano Wilson, LLP, Reno, NV, for Plaintiff.

Daniel J. LaCombe, Morley Witus, and Sharon M. Woods, Barris, Sott, Denn & Driker, P.L.L.C, Detroit, MI; Joanne Geha Swanson, Ricardo J. Lara, and William A. Sankbeil, Kerr, Russell & Weber, PLC, Detroit, MI; William C. Bundren, Wm. Charles Bundren & Associates, Frisco, TX; Adam K. Bult, Kirk B. Lenhard, Molly Malone Rezac, and Wayne O. Klomp, Jones Vargas, Reno, NV, for Defendant, Signature Management Team, LLC d/b/a Team.

Michael Y. McCormick, McCormick, Hancock & Newton, Houston, TX; Evan Beavers, Minden, NV, for Subpoena Respondents.

Daniel A. O'Brien, O'Brien Legal Services, Walled Lake, MI, Molly Malone Rezac, Wayne O. Klomp, and Adam K. Bult, Jones Vargas, Reno, NV, for Respondent, Benjamin L. Dickie, III.

### ORDER

EDWARD C. REED, District Judge.

Plaintiff Quixtar is a company that was formerly known as Amway. Defendant Signature Management TEAM ("TEAM") is a company that was started by former "Independent Business Operators" ("IBOs") with Quixtar. Plaintiff's Complaint (# 1), filed on October 23, 2007, states causes of action against Defendant for (1) violation of the Lanham Act, (2) trade secret misappropriation, (3) tortious interference with existing contracts, (4) tortious interference with advantageous business relations, and (5) a declaratory judgment regarding the viability of claims brought against Quixtar in Collin County Texas. Defendant's Counter-claim (# 15), filed on November 14, 2007, states causes of action for (1) tortious interference with existing and advantageous business relations, (2) defamation, and (3) a declaratory judgment both that TEAM is not in viola-

tion of the Quixtar rules of conduct and that Quixtar's "IBO" contracts are unenforceable.

Currently pending before the Court is Defendant's Motion to Transfer the Case to the Eastern District of Texas, Sherman Division, Based on 28 U.S.C. § 1404(a)(# 22). Also pending is Benjamin Dickie's Objection to [the] Magistrate Judge's April 7, 2008 Order (# 124). Defendant TEAM has concurred (# 125) in that objection. For the reasons stated below, the motion (# 22) to transfer is **DENIED** and Dickie's objection (# 124) is **SUSTAINED** in part.

## I. Defendant TEAM's Motion to Transfer

Defendant TEAM moves the Court to transfer this case to the Eastern District of Texas. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The burden of demonstrating that transfer is appropriate under section 1404(a) falls on the movant. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 279 (9th Cir.1979).

The basic framework for deciding whether to transfer a case pursuant to section 1404(a) requires weighing (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice. *Miracle Blade, LLC. v. Ebrands Commerce Group, LLC,* 207 F.Supp.2d 1136, 1155–56 (D.Nev.2002). A non-exclusive list of related considerations includes (1) the plaintiff's choice of forum; (2) the parties' contacts with the forum, and the extent to which the contacts are related to the pending action; (3) access to proof; (4) the cost of litigating in the two forums; (5) the availability of compulsory process, (6) judicial economy; (7) the

court's familiarity with the governing law; and (8) the public policy of the forum state. *See Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498–99 (9th Cir.2000); *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986).

Transfer under section 1404(a) "should not be freely granted." *In re Nine Mile Ltd.,* 692 F.2d 56, 61 (8th Cir. 1982), *overruled on other grounds by Mo. Hous. Dev. Comm'n v. Brice,* 919 F.2d 1306, 1311 (8th Cir.1990). "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal,* 805 F.2d at 843. Indeed, normally the plaintiff's choice of forum is given paramount consideration, *Galli v. Travelhost, Inc.,* 603 F.Supp. 1260, 1262 (D.Nev.1985). Some courts have afforded less deference to a plaintiff's choice of forum where the plaintiff has not chosen its home forum. *See, e.g., Bryant v. ITT Corp.,* 48 F.Supp.2d 829, 832 (N.D.Ill.1999) ("where the plaintiff's chosen forum is not the plaintiff's home forum or lacks significant contact with the litigation, the plaintiff's chosen forum is entitled to less deference"). *Cf. Iragorri v. United Technologies Corp.,* 274 F.3d 65, 72 (2d Cir.2001) (adopting a sliding scale approach towards *forum non conveniens* ).

Here, Defendant TEAM is organized under the laws of the State of Nevada and TEAM is also apparently owned by several Nevada corporations. TEAM'S principal place of business is in Michigan. Plaintiff Quixtar is a Virginia corporation, headquartered in Michigan. Although Plaintiff has not brought this actions in its home forum, Plaintiff's decision to litigate this case in Nevada was not arbitrary. Further, it is readily apparent that this is not a dispute that is local in scope; no forum will be without its inconveniences. The Court finds that Plaintiff's choice of

forum in this case is entitled to substantial, but certainly not dispositive weight.

Defendant's principal argument is that this case should be transferred due to ongoing litigation in state and federal courts in Texas, either on the grounds of judicial economy or for the convenience of the witnesses who may be called to testify in those cases. Defendant, however, has not made a substantial showing that judicial economy will be facilitated by transferring this action. With respect to litigation in federal court, one related federal action in Texas (*Simmons v. Quixtar*, 4:07–CV–389–MHS–DDB) has been referred to arbitration and a second (*Simmons v. Quixtar*, 4:07–CV–487–MHS–DDB) has been stayed on the basis of the *Colorado River* doctrine. Consolidation is thus unavailing. Neither has Defendant made any substantial showing that the litigation in Texas state court renders transfer appropriate. Indeed, beyond the obvious fact that state and federal cases cannot be consolidated, one related case in Texas state court was dismissed on the basis of *forum non conveniens*. The assertion that discovery could be coordinated between state and federal cases is too speculative to be given significant weight. Finally, while Defendant contends that some of its important witnesses reside in Texas, Plaintiff has identified "other witnesses it intends to call who reside in Nevada".[1] *See Graff v. Qwest Commc'ns Corp.*, 33 F.Supp.2d 1117, 1121 (D.Minn.1999) ("[T]ransfer should not be granted if the effect is simply to shift the inconvenience to the party resisting the transfer.") (citing *Van Dusen v. Barrack*, 376 U.S. 612, 646, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)), *Gherebi v. Bush*, 352 F.3d 1278, 1303 (9th Cir.2003) (same), *vacated on other grounds*, 542 U.S. 952, 124 S.Ct. 2932, 159 L.Ed.2d 835 (2004).

The Court gives significant weight to the fact that Plaintiff seeks a declaratory judgment related to TEAM's dismissed state law claims in Collin County Texas. Texas courts obviously have more expertise with issue of Texas law than Nevada courts, and this issue on its own makes the matter of whether to transfer this case quite close. By contrast, because no issue of corporate law is pleaded or otherwise apparent in this case, the Court does not give any weight at all to Plaintiff's contention that Defendant has abused Nevada corporate law.

All in all, the balance is close to equipoise. Accordingly, the motion (# 22) to transfer this case to the Eastern District of Texas, Sherman Division, is **DENIED.**

## II. Dickie and TEAM'S Objection

Benjamin Dickie and Defendant TEAM object (## 124, 125) to the Magistrate Judge's second Order (# 111) granting Plaintiff Quixtar's motion (# 54) to compel. The objection presents novel questions of law and will be sustained to the extent outlined below.[2]

### A. Background

Plaintiff contends that TEAM has waged a wrongful, illegal internet cam-

---

[1]. In general, the convenience that a transfer would have for counsel is not a relevant consideration under section 1404(a). *See Grubs v. Consol. Freightways, Inc.*, 189 F.Supp. 404, 410 (D.Mont.1960). Even if it were relevant, it would not be given significant weight here. Defendant has retained competent counsel in Nevada and has not demonstrated any significant prejudice in defending this case in Nevada on this basis.

[2]. The Magistrate Judge gave quite careful attention to these novel I issues, but did not have the opportunity to address the issue of ! standing because it was not raised. The Court is obliged to review' the parties' legal contentions *de novo*, and does so in this Order.

paign to induce Quixtar's "IBOs" to defect from Quixtar. In connection with Plaintiffs causes of action for tortious interference with business relations and tortious interference with an existing contract, Plaintiff took Benjamin Dickie's deposition on January 18, 2008. (Ex. P to P. Quixtar's Opp. (# 141).) According to Dickie, a part of his duties as a TEAM employee has been to work as a content manager for TEAM'S web sites and blogs.[3] Dickie testified that these sites include "www.theteam.biz," "www.chrisbrady.com," "orrinwoodward.com," "www.launching-a-leadership-revolution.com," "orrinwoodward.mindsay.com," "orrinwoodward.tripod.com," and possibly others. When Plaintiff's counsel inquired whether there were other blogs that Dickie had set up, he responded in the affirmative and his counsel objected. Dickie's counsel then instructed Dickie not to answer questions regarding a pending lawsuit in Ottawa County (Michigan) on the basis of First Amendment privilege. The limited record indicates that this lawsuit was filed by Quixtar against unnamed Doe defendants. Dickie refused to answer any questions regarding whether he had any role in establishing or maintaining "freetheibo.com," "drinkxs.biz," "theiborebellion," "qreilly," "freetheibo blog," "quixtarlostmycents," "saveusdickdevos," "teamfoundingfathers," "quixtartoday," "integrityisteam," or "quixtatic." He also refused to answer whether he knew who posted videos on the internet under the titles "Hooded Angry Man," "Hooded Angry Man 2," "The New Amway Highlights," "Stevie goes to China," "Sha-

meus McSteeley Quixtar versus Meijer," "Rich DeVos, Who's Running Your Company?," "Amway Yesterday," "Quixtar Tell Me Sweet Little Lies," and "Boston Teaberry Party."[4] Dickie also refused to answer if there were other sites that he believed were covered by the privilege, and he refused to answer if he had ever posted under a pseudonym. Dickie's counsel explained that the privilege extended to his involvement or non-involvement with all of these web sites. At the time, the Michigan court had not addressed the issue of the discoverability of the identities of the Does, and there is no indication in the record that it has done so since. There is no information in this record regarding any subsequent rulings of the Michigan court.

Plaintiff filed a motion to compel (# 54) responses from Benjamin Dickie. The Magistrate Judge held a hearing on February 2, 2008, to address these and other pending motions. At the hearing, the Magistrate Judge stated that Plaintiff must be afforded the ability to ask about whether Dickie established various web sites to support its cause of action for tortious interference with a contract. (Hearing Tr., p. 46, Ex. B to P. Quixtar's Opp. (# 141).) Shortly thereafter, however, Quixtar's counsel posed the following question:

> Mr. Chao: Let me ask you a question. We've already established, I think, through the questioning of the Court and Mr. O'Brien's answer, that if there's tortious conduct there's no First Amend-

3. "Blog" is short for "web log," which may be defined as follows: "A frequently updated web site consisting of personal observations, excerpts from other sources, etc., typically run by a single person, and usually with hyperlinks to other sites; an online journal or diary." *Oxford English Dictionary*, http://dictionary.oed.com (last visited June 24, 2008).

4. As is true with any evidence, the Court will not independently research any of these web sites and will only consider evidence that is in the custody of the Clerk of the Court. A citation to a web site is insufficient to put the contents of that site into the Court's record.

ment protection; so if there's a website out there, and let's say it's not affiliated with TEAM but he knows who it is, there's no First Amendment protection, and we should be allowed, should we not, to inquire into that?

The Magistrate Judge responded:

> The Court: Well, no, not right now, because right now you have not shown me what's on every one of those websites that you believe is tortious. The answer to that is no.

(Hearing Tr., p. 46, Ex. B to P. Quixtar's Opp. (# 141).) Quixtar's counsel then distinguished between Dickie's role as a potential independent author and his role as an employee of TEAM, and further asserted that under the most demanding precedents, Quixtar had made the showing necessary to compel Dickie to answer. (*Id.* at 76.)

The Magistrate Judge focused primarily on whether Plaintiff's questions could be addressed to Dickie as an individual or merely in his capacity as an employee; the ultimate minute order granted Quixtar's motion, as follows:

> IT IS ORDERED that the Motion to Compel Responses from Deponent Benjamin Dickie (Docket # 54) is GRANTED to the extent that Mr. Dickie shall respond to Quixtar's questions about his knowledge regarding the Internet sites, blogs, and videos that contain statements about Quixtar; both in his individual capacity and as an employee of TEAM.

(Order of February 21, 2008(# 72).) Dickie then filed a motion for clarification (# 84), in which TEAM joined (# 85). The Magistrate Judge granted the motion for clarification, issuing the following revised ruling:

> Mr. Dickie is to answer questions on the following:

1. Websites, blogs and videos which Mr. Dickie created or on which he posted content, as an individual or as a TEAM employee;
2. Websites, blogs and videos which other TEAM employees created or on which they posted content;
3. Websites, blogs and videos which TEAMS management and leaders (founders of TEAM, policy council members and other TEAM-identified "leadership") created or on which they posted content.

> If following entry of this Order Quixtar learns of websites, blogs and videos containing potentially [tortious] content, the parties will submit letter briefs of no more than two (2) pages, exclusive of the excerpt of the potentially [tortious] content, for resolution by the court. If the court concludes that such additional content is potentially [tortious] then Mr. Dickie will be directed to answer questions regarding such websites, blogs and videos.

(Order of April 7, 2008 (# 111).) Dickie filed his objection (# 124) on April 24, 2008, which TEAM joined (# 125). Quixtar filed its opposition (# 141) to the objection on May 19, 2008.

### B. Standard of Review

"A district judge may reconsider any pretrial matter referred to a magistrate judge in a civil or criminal case pursuant to LR IB 1–3 where it has been shown that the magistrate judge's ruling is clearly erroneous or contrary to law." Local Rule IB 3–1; *see* 28 U.S.C. § 636(b)(1)(A). The "contrary to law" standard only applies to the Magistrate Judge's legal conclusions, which are reviewed *de novo.*

### C. Relevant Authority in Analogous Circumstances

Dickie and Defendant TEAM argue that this Court should apply the standard artic-

ulated in *Doe v. Cahill*, 884 A.2d 451 (Del. 2005) and *Dendrite International, Inc. v. Doe No. 3*, 342 N.J.Super. 134, 775 A.2d 756 (N.J.Super.Ct.App.Div.2001), and vacate the Magistrate Judge's order. Plaintiff Quixtar, on the other hand, argues that (1) the First Amendment is not implicated because tortious speech is not protected by the First Amendment; (2) the First Amendment affords no protections to anonymity in the context of "commercial speech"; (3) Quixtar has met any of the standards various courts have announced for requiring the disclosure of anonymous internet authors,[5] which Plaintiff also asserts are inapplicable here because this case does not involve a subpoena to an internet service provider ("ISP"); and finally, (4) Dickie lacks standing to object to discovery based on the purported rights of anonymous third parties.

Typically, analogous situations to the one presented here arise when a plaintiff seeks to compel an ISP to disclose the identity of a "Doe defendant" who wishes to remain anonymous. *See generally Krinsky v. Doe 6*, 159 Cal.App.4th 1154, 72 Cal.Rptr.3d 231 (6th Dist.2008) (collecting and reviewing cases); Michele McCarthy, *Right of Corporation, Absent Specific Statutory Subpoena Power, to Disclosure of Identity of Anonymous or Pseudonymous Internet User*, 120 A.L.R. 5th 19b (2004) (same); Michael Vogel, *Unmasking "John Doe" Defendants: The Case Against Excessive Hand–Wringing Over Legal Standards*, 83 Or. L.Rev. 795 (2004); Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, 49 Duke L.J. 855 (2000). This is, apparently, the posture of the related case in Michigan. Several approaches have arisen in these circumstances. Despite differences,

the weight of authority holds that courts must adopt procedures that strike a balance between the plaintiff's need to destroy the Doe's anonymity and the anonymous speaker's First Amendment rights. Moreover, no decision this Court has encountered has simply rejected procedural precautions on the basis that the anonymous speech was commercial in nature.

In the approach taken by the court in *In re Subpoena Duces Tecum to America Online, Inc.*, 52 Va. Cir. 26, 2000 WL 1210372 (2000), *rev'd on other grounds by Am. Online v. Anonymous Publicly Traded Co.*, 261 Va. 350, 542 S.E.2d 377 (Va. 2001), disclosure will only be compelled if the evidence is required for the case and "the party requesting the subpoena has a legitimate, good faith basis to contend that it may be the victim of conduct actionable in the jurisdiction where suit was filed. . . ." *Id.* at *8. This approach has been faulted for "offer[ing] no practical, reliable way to determine the plaintiff's good faith and leav[ing] the speaker with little protection." *Krinsky*, 159 Cal. App.4th at 1167, 72 Cal.Rptr.3d 231 (modification supplied).

A second approach requires the court to evaluate the plaintiff's need to identify the speaker, and requires that the plaintiff's allegations of illegality be able to withstand a motion to dismiss. *See Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 578–80 (N.D.Cal.1999) (requiring plaintiff to (1) "identify the missing party with sufficient specificity such that the Court can determine that the defendant is a real person or entity who could be sued · in federal court"; (2) "identify all previous steps taken to locate the elusive defendant"; (3) "establish to the Court's satisfaction that the plaintiff's suit against the

---

**5.** We consider authors writing under a pseudonym to be anonymous for the purposes of the issues raised in this Order.

defendant. could withstand a motion to dismiss"; and (4) "file a request for discovery with the Court, along with a statement of reasons justifying the specific discovery requested as well as identification of a limited number of persons or entities on whom discovery process might be served and for which there is a reasonable likelihood that the discovery process will lead to identifying information about defendant that would make service of process possible"). The motion to dismiss approach has also been criticized by some courts for offering insufficient protections to anonymous speakers. *See Highfields Capital Mgmt., L.P., v. Doe,* 385 F.Supp.2d 969, 975 & 975 n. 8 (N.D.Cal.2005) ("It is not enough for a plaintiff simply to plead and pray. Allegation and speculation are insufficient. The standards that inform Rule 8 and Rule 12(b)(6) offer too little protection to the defendant's competing interests."),

A third, more demanding approach requires a plaintiff to submit evidence sufficient to overcome a limited motion for summary judgment attacking the actionability of the allegedly defamatory statements. *See Cahill,* 884 A.2d 451 (embracing and clarifying the standard applied in *Dendrite Int'l,* 342 N.J.Super. 134, 775 A.2d 756). The "prima facie" or "summary judgment" procedure is limited to evidence that is or should be in the possession of the plaintiff. Thus, whether or not the plaintiff is a public figure, he or she need not present evidence of "actual malice" as this would require evidence that the plaintiff does not have.[6] *Cahill,* 884 A.2d at 464. The *Dendrite* standard, as summarized by *Cahill,* requires a plaintiff:

(1) to undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for an order of disclosure, and to withhold action to afford the anonymous defendant a reasonable opportunity to file and serve opposition to the application. In the internet context, the plaintiff's efforts should include posting a message of notification of the discovery request to the anonymous defendant on the same message board as the original allegedly defamatory posting;

(2) to set forth the exact statements purportedly made by the anonymous poster that the plaintiff alleges constitute defamatory speech; . . . .

(3) to satisfy the *prima facie* or "summary judgment standard"; [and]

(4) [to] balance the defendant's First Amendment right of anonymous free speech against the strength of the *prima facie* case presented and the necessity for the disclosure of the anonymous defendant's identity in determining whether to allow the plaintiff to properly proceed.

*Cahill,* 884 A.2d at 460 (modifications supplied); *see also Highfields,* 385 F.Supp.2d at 974 n. 6, 975 n. 8 (relying on *Dendrite* ); *Best Western Int'l., Inc. v. Doe,* CV–06–1537–PHX–DGC, 2006 WL 2091695 (D.Ariz.2006) (unreported) (following *Cahill* ); *Krinsky,* 159 Cal.App.4th at 1170–72 & 1172 n. 14, 72 Cal.Rptr.3d 231 (reviewing authority and adopting a "prima facie" test equivalent to that in *Cahill* ). The *Cahill* court shortened the test, retaining the notice requirement but opining that the second requirement and the fourth requirement should both be considered implicit in the third requirement. 884 A.2d at 461. Thus, *Cahill* requires that the

---

**6.** Dickie and Quixtar ask the Court to adopt *Cahill,* but ignore this component of the *Ca-* *hill* opinion.

plaintiff give notice, or attempt to do so,[7] and that the plaintiff satisfy a "prima facie or 'summary judgment standard'." 884 A.2d at 460–61.

Finally, *Matrixx Initiatives, Inc. v. Doe*, 138 Cal.App.4th 872, 42 Cal.Rptr.3d 79 (6th Dist.2006), allowed discovery to proceed without inquiring into the protections required by the First Amendment on the basis that the party who opposed discovery was not, or at least did not admit to being, the anonymous author. There, the plaintiff traced postings made under two pseudonyms on an internet financial bulletin board to a hedge fund, and the hedge fund's manager refused to answer any questions regarding the identities of the anonymous authors at his deposition on the grounds that their anonymity was protected by the First Amendment. *Id.* at 876, 42 Cal.Rptr.3d 79. The California Court of Appeal held that under these circumstances the non-party lacked standing to raise the issue of the anonymous speaker's First Amendment rights. *Id.* at 879–81, 42 Cal.Rptr.3d 79. Although the California Court of Appeal is not an Article III court, the Court relied on Article III jurisprudence, *id.* at 878 n. 4, 42 Cal. Rptr.3d 79, and found that the party seeking to quash discovery did not have the "close relationship" with the anonymous author required to raise the third party's rights.[8] *Id.* at 880–81, 42 Cal.Rptr.3d 79 (citing *NAACP v. Ala.*, 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)).

## D. Analysis of Dickie and TEAM'S Objection

█ While a pseudonym can certainly be expressive, more important than the expression of the pseudonym, at least in general, is the condition of expression that anonymity affords.[9] Anonymity can focus the audience on the speech rather than the speaker, and more pragmatically, it is a useful antidote to reprisal and the other potential inconveniences and adversities of publicity. "Anonymity," the Supreme Court has noted, "is a shield from the tyranny of the majority," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), and "[t]he decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *Id.* at 341–42, 115 S.Ct. 1511.[10] Where speakers

---

7. *Cahill* appears to insist that the plaintiff post a message on the web site at issue. This poses numerous problems, including the fact that the internet site may no longer exist. *See Krinsky*, 159 Cal.App.4th at 1170 & n. 11, 72 Cal.Rptr.3d 231.

8. The *Matrixx* court's factual reasoning is not entirely clear. The court noted that the postings could be traced to a hedge fund, but nevertheless considered the anonymous authors to be "presumably unrelated third parties." 138 Cal.App.4th at 881, 42 Cal.Rptr.3d 79.

9. The distinction is significant: As a condition of speech, rather than pure speech, anonymity is unique in that it can be subsequently destroyed through negligence, or for that matter, an intentional act of the speaker.

10. On numerous occasions the Supreme Court has held that anonymity must be afforded some amount of First Amendment protection, albeit in cases primarily involving prior restraints. *See Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 200, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (invalidating a statute that required circulators of an initiative petition to wear identification badges); *McIntyre*, 514 U.S. at 357, 115 S.Ct. 1511 (overturning law that prohibited distribution of campaign literature that did not contain the name and address of the distributor); *Talley v. California*, 362 U.S. 60, 65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (invalidating law prohibiting the distribution of "any handbill in any place under any circumstances" that did not contain the name and address of the person who prepared it, on the grounds that the law would chill "perfectly peaceful

may remain anonymous, ideas are communicated that would not otherwise come forward. *See Doe v. 2TheMart.com, Inc.*, 140 F.Supp.2d 1088, 1092 (W.D.Wash.2001) ("The right to speak anonymously extends to speech via the Internet. Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas."). To fail to protect anonymity is, therefore, to chill speech. Yet where speakers remain anonymous there is also a great potential for irresponsible, malicious, and harmful communication, and the lack of accountability that anonymity affords is anything but an unqualified good. This is particularly true where the speed and power of internet technology makes it difficult for the truth to "catch up" to the lie. *See* Lidsky, *Silencing John Doe*, 49 Duke L.J. at 864. Anonymity thus presents benefits, risks, and problems. To the extent that Courts take on the task of protecting it, balancing is inevitable.

██ With this in mind, caution is warranted with respect to purported *per se* rules. In particular, a *per se* assertion that the First Amendment does not protect tortious speech is not terribly helpful for the purposes of legal analysis.[11] First, the scope of First Amendment protections of speech is not, and should not be defined by state law torts.[12] Second, states, including the State of Nevada, have long recognized the importance of the First Amendment in crafting and delimiting the scope of actionable defamation. Third, the tort of interference with a contract need not, at least in theory, be founded in speech at all, but this cannot mean that the First Amendment is not implicated by the cause of action where speech is alleged to be harmful. *See Blatty v. New York Times Co.*, 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177, 1183 (1986) ("The fundamental reason that the various limitations rooted in the First Amendment are applicable to all injurious falsehood claims and not solely to those labeled 'defamation' is plain: although such limitations happen to have arisen in defamation actions, they do not concern matters peculiar to such actions but broadly protect free-expression and free-press values."). Fourth, and relatedly, there is every reason to predict that the Nevada Supreme Court would apply state law privileges designed to protect speech in the context of tortious interference with a contract, just as it has with defamation. *Cf. Blatty*, 232 Cal.Rptr. 542, 728 P.2d at 1183.[13] Thus, in sum, the

discussions of public matters of importance"); *NAACP v. Ala.*, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (holding that discovery order requiring NAACP to disclose its membership interfered with freedom of association). *But cf. Branzburg v. Hayes*, 408 U.S. 665, 695–708, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (White, J., writing for a plurality) (concluding that a reporter does not have a First Amendment right not to reveal unnamed sources to a grand jury).

**11.** *Compare Beauharnais v. People of State of Ill.*, 343 U.S. 250, 254–255, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (libelous utterances are unprotected speech); *Chaplinsky v. State of N.H.*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (same), *with New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84

S.Ct. 710, 11 L.Ed.2d 686 (1964) (holding that prohibitions against libel "can claim no talismanic immunity from constitutional limitations").

**12.** *New York Times Co.*, 376 U.S. at 269, 84 S.Ct. 710.

**13.** Notably, there is no First Amendment "opinion privilege," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 3, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), but the Nevada Supreme Court recognizes such a privilege. *See Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 57 P.3d 82, 87 (2002) ("Statements of opinion cannot be defamatory because 'there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges

Court must look beyond a simple recitation of the elements of the torts at issue in this case to determine whether the statements are actionable.

■ Of course, the inquiry is also complicated by the fact that it is impossible on this record to establish whether Dickie or TEAM have standing to raise their objection. *See Matrixx*, 138 Cal.App.4th 872, 42 Cal.Rptr.3d 79. The well established rule, subject to pragmatic and important exceptions,[14] is that, "[i]n the ordinary case, a party is denied standing to assert the rights of third persons." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *see, e.g., Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Warth*, 422 U.S. at 501, 95 S.Ct. 2197. "*Jus tertii*" standing generally requires (1) that the litigant has suffered an injury in fact, (2) that the litigant has a "close relationship" to the third party, and (3) that there is some hindrance to the third party's ability to protect his or her own interests. *Powers*, 499 U.S. at 411, 111 S.Ct. 1364. It should be noted that the inquiry into whether there is a "close relationship" is functional in nature, and it is not necessarily required that the parties know, work, or associate with one another. *See id.* at 413, 111 S.Ct. 1364 (juror and criminal defendant have required relationship where "the relationship between

[them is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter") (modification supplied; quoting *Singleton v. Wulff*, 428 U.S. 106, 115, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)). Even with this observation, however, it is impossible to determine on this record if either of the first two requirements for third party standing are met.

Among the many reasons for requiring parties to rely on their own rights in Article III courts is the need to avoid simple obstruction based on speculation regarding the positions of persons not before the court. Dickie has no standing to object to answering questions about what he does not know with respect to internet sites with which he has no involvement. Dickie may or may not have standing to otherwise object, depending upon the facts which he refuses to divulge. Moreover, to the extent that he does have standing, he clearly cannot refuse to answer if he had any involvement with the mere administration of a website without articulating why this administration implicates his First Amendment rights.

Plaintiff is correct that the authors of the internet postings at issue could have contested the discovery of their identities using pseudonyms in this Court. *See Doe v. Bolton*, 410 U.S. 179, 187, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (use of a pseudonym in litigation is permissible and does not destroy standing). Again, this is the typi-

and juries but on the competition of other ideas.' ") (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

14. *E.g. Powers v. Ohio*, 499 U.S. 400, 415, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (defendant in a criminal case has standing to raise the third-party equal protection claims of jurors excluded by the prosecution because of their race); *Craig v. Boren*, 429 U.S. 190, 192–94, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (permitting beer vendors to assert rights of

prospective male customers who were barred, unlike females of the same ages, from purchasing beer). Notably, third party standing is a jurisprudential, not a constitutional or jurisdictional problem. *Craig*, 429 U.S. at 193–94, 97 S.Ct. 451; *see also Warth v. Seldin*, 422 U.S. 490, 500–01, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties.").

cal posture of similar cases. Nevertheless, the fact that the third parties may not have been put on notice that their identities may be divulged via discovery is certainly a potential "hindrance to the third party[ies'] ability to protect [their] interests." *Powers*, 499 U.S. at 411, 111 S.Ct. 1364 (modification supplied).

In this Court's view, the fact that there has been an insufficient showing of standing, third party or otherwise, should not simply end the inquiry. First, it is possible that such a showing could be made in this case without creating a situation where there is "nullification of the right at the very moment of its assertion." *NAACP*, 357 U.S. at 459, 78 S.Ct. 1163. Second, the fact that permitting discovery amounts to prospective court action is not insignificant here, and the Court is not without independent authority to adopt procedures to protect against potential violations of third party constitutional rights. To fail to inquire into the merits of this issue, *e.g.*, *Matrixx*, 138 Cal.App.4th 872, 42 Cal.Rptr.3d 79, may well be to decide them in practice, and this is problematic where there is at least good reason to believe that the anonymous authors of the internet postings would object to their identities being revealed without notice.

The order of the Magistrate Judge will be vacated in order to allow Dickie and TEAM a reasonable opportunity to notify third party authors that Dickie may be obliged to reveal their identities. Any party, including Dickie, who wishes to oppose the divulgence of his or her identity may do so under a pseudonym,[15] and the Court

should refrain from acting for a reasonable amount of time to allow for this possibility. That said, the Court will not consider any further objections based on anonymity unless there is a factual basis for finding that the objecting party has standing to raise the objection.

■ For the guidance of the Magistrate Judge, the Court finds that so long as an objection is raised by a party with standing to raise it, *Cahill* articulates the correct standard. *See Highfields*, 385 F.Supp.2d at 975. *Cf. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168–69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) ("federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later"). It appears that the Magistrate Judge tailored the discovery he allowed to the elements of the torts at issue. On the one hand, no tailoring beyond the general restraints of relevance is necessary unless a party with standing makes a proper objection. On the other hand, more particularized tailoring may be necessary if a proper objection is raised. In particular, to the extent that a party with standing raises a meritorious objection, Plaintiff should not be afforded discovery regarding the identity of any anonymous author where the exact statement at issue has not been put into evidence.[16] Nor is discovery warranted into the identity of an anonymous author where it is beyond reasonable dispute that the particular internet postings at issue are subject to a privilege or defense.

---

15. The Court notes that this likely would have been the procedure if the facilitator of the third party internet communication had been a cable ISP. *See* 47 U.S.C. § 551(c)(2)(B); *Cahill*, 884 A.2d at 455 & n. 4. *E.g. Warner Bros. Record Inc. v. Does 1–14*, 555 F.Supp.2d 1 (D.D.C.2008) (allowing subpoena of ISP, but also allowing subscriber time to file mo-

tion to quash). The Court sees no reason why this is not analogous and persuasive authority regarding the principles that should apply here.

16. For example, at present, neither the videos nor any detailed description of their contents is in the Court's record.

## III. Conclusion

***IT IS, THEREFORE, HEREBY OR-DERED THAT*** the motion (# 22) to transfer this case to the Eastern District of Texas is ***DENIED.***

***IT IS FURTHER ORDERED THAT*** Dickie's objection (# 124) is ***SUSTAINED*** to the extent stated in this Order. The Order of April 7, 2008 (# 111) is ***VACATED*** and the matter is ***REMANDED*** to the Magistrate Judge for further proceedings. Dickie's motion (# 159) to file a reply brief is ***DENIED*** as moot.

The Magistrate Judge should withhold action for a reasonable period of time (1) to allow Dickie and TEAM to notify interested parties that, if they wish to do so, they may contest the discovery of their identities under pseudonyms, and (2) to allow any such party to file an opposition. Any party that raises an objection must demonstrate that he or she has standing to raise the objection. At present, no such showing has been made. The nature of any further proceedings that may be required is left to the Magistrate Judge's wise discretion.