966 A.2d 432

**INDEPENDENT NEWSPAPERS, INC.**

v.

**Zebulon J. BRODIE.**

**No. 63, Sept. Term, 2008.**

Court of Appeals of Maryland.

Feb. 27, 2009.

**416**

Paul Alan Levy (Adina Rosenbaum, Public Citizen Litigation Group, Washington, DC; Bruce W. Sanford, Mark I. Bailen, Laurie A. Babinski, Baker & Hostetler, LLP, Washington, DC), on brief, for Appellant.

Clifford M. Sloan, Amy R. Sabrin, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, brief of Amici Curiae Maryland-Delaware-DC Press Association, Cable News Network, Inc., E.W. Scripps Co., Gannett Co., Inc., and WashingtonPost.newsweek Interactive in Support of Appellant.

Lucy A. Dalglish, Gregg P. Leslie, Matthew B. Pollack, The Reporters Committee for Freedom of the Press, Arlington, VA, brief of Amici Curiae The Reporters Committee for Freedom of the Press, American Society of Newspaper Editors, Specialized Information Publishers Ass'n, and The American Civil Liberites Union of Maryland in support of Petitioner Independent Newspapers, Inc.

E. Sean Poltrack (Foster, Braden & Thompson, LLP, Stevensville), on brief, for Appellee.

Argued Before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, Judge.

In this case, we are called upon to decide whether a circuit court judge, in a defamation action, appropriately denied a motion to quash/motion for protective order regarding a subpoena requiring, Independent Newspapers, Inc., a company that commissioned an Internet forum (for which it required participants to register), to identify five Internet forum participants known only by their pseudonyms or usernames. Independent Newspapers appealed the denial of the motion, and we granted certiorari, *Independent Newspapers v. Brodie*, 405 Md. 505, 954 A.2d 467 (2008), prior to any proceedings in the Court of Special Appeals to address the following questions:

> 1. May a court breach the constitutional right to speak anonymously and order the identification of Internet speakers who are alleged to have violated the plaintiff's rights without a factual and legal showing that the plaintiff has a supportable claim on the merits?
>
> 2. Did plaintiff Brodie make the required showing in this case?

We shall conclude that the circuit court judge abused his discretion when ordering the identification of the five anonymous Internet forum participants, because the three participants sued, concededly, did not make the alleged defamatory statements, while the other two anonymous participants, who allegedly made the actionable remarks, were not sued by Brodie. For guidance to the trial courts, we, nevertheless, will discuss the standard that should be applied to balance the First Amendment right to anonymous speech on the Internet with the opportunity on the part of the object of that speech to seek judicial redress for alleged defamation.

## I.

In one of our first opportunities to consider legal issues arising from an Internet communications context, *Beyond Systems, Inc. v. Realtime Gaming Holding Company, LLC*, 388 Md. 1, 20–21, 878 A.2d 567, 579 (2005), we quoted *Reno v. American Civil Liberties Union*, 521 U.S. 844, 849–50, 117

S.Ct. 2329, 2334, 138 L.Ed.2d 874, 884 (1997), in which the Supreme Court defined the Internet as:

[A]n international network of interconnected computers. It is the outgrowth of what began in 1969 as a military program called "ARPANET," [an acronym for the network developed by the Advanced Research Project Agency] which was designed to enable computers operated by the military, defense contractors, and universities conducting defense-related research to communicate with one another by redundant channels even if some portions of the network were damaged in a war.

While the ARPANET no longer exists, it provided an example for the development of a number of civilian networks that, eventually linking with each other, now enable tens of millions of people to communicate with one another and to access vast amounts of information from around the world.

In *Beyond Systems*, we also discussed the logistics of the transmission of e-mails on the Internet and the role of an Internet Service Provider (ISP) when transmitting e-mail messages:

Because the Internet is a global network of computers, "each computer connected to the Internet must have a unique address," known as an Internet Protocol Address, which "can be used to identify the source of the connection" to the Internet.

When connected to the Internet, computers communicate with each other through the use of a "protocol stack," which is usually the "TCP/IP protocol stack." For example, when someone is sending an e-mail, the e-mail message enters through the Application Protocols Layer, which corresponds to specific programs such as browsers for using the World Wide Web and e-mail. The message then enters the Transmission Control Protocol ("TCP"), which directs certain information to a specific application or program on a computer using a port. From the TCP layer of the protocol stack, the message then moves into the Internet Protocol

Layer, which directs the message to a specific computer using an IP address. The final step in the process prior to entering the Internet is for the Hardware Layer to convert the message from binary data to network signals.

The message is then transmitted via an Internet Service Provider ("ISP") which examines the IP address of the message and routes the information to the computer with the proper IP address. When the message reaches its intended recipient, the receiving computer reverses the TCP/IP protocol stack and the message is decoded.

*Id.* at 21–22, 878 A.2d at 579–80 (citations and footnotes omitted).

Consistent with the development of communication opportunities on the Internet, we now are presented with a confrontation between defamation law and the use of the World Wide Web,[1] regarding statements made in an e-mail or an instant

---

1. In *Reno v. ACLU*, 521 U.S. 844, 852–53, 117 S.Ct. 2329, 2335, 138 L.Ed.2d 874, 885–86 (1997), the Supreme Court described the World Wide Web:

The best known category of communication over the Internet is the World Wide Web, which allows users to search for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world. Some of these documents are simply files containing information. However, more elaborate documents, commonly known as Web "pages," are also prevalent. Each has its own address—"rather like a telephone number." Web pages frequently contain information and sometimes allow the viewer to communicate with the page's (or "site's") author. They generally also contain "links" to other documents created by that site's author or to other (generally) related sites. Typically, the links are either blue or underlined text—sometimes images.
Navigating the Web is relatively straightforward. A user may either type the address of a known page or enter one or more keywords into a commercial "search engine" in an effort to locate sites on a subject of interest. A particular Web page may contain the information sought by the "surfer," or, through its links, it may be an avenue to other documents located anywhere on the Internet. Users generally explore a given Web page, or move to another, by clicking a computer "mouse" on one of the page's icons or links. Access to most Web pages is freely available, but some allow access only to those who have purchased the right from a commercial provider. The Web is

message, as well as on an online "blog," "chatroom" or "discussion forum," using a username or pseudonym to retain anonymity. A username or a screen name is "[t]he name you use to identify yourself when logging into a computer system or online service. Both a username (user ID) and a password are required. In an Internet e-mail address, the username is the left part before the @ sign." PC Magazine Online Encyclopedia, PCMag.com, "username," http://www.pcmag.com/encyclopedia/ (last visited Feb. 19, 2009).[2]

E-mails and instant messaging form a first category of such communications, where users generally know with whom they are communicating. The word *e-mail* stands for *electronic mail* and is the "transmission of text messages and optional file attachments over a network." *Id.*, "e-mail." There are two primary ways in which users obtain e-mail service: through an e-mail client and over the World–Wide–Web:

**The E–Mail Client**

The use of a mail program (also known as a "mail client" or "e-mail client") such as Outlook, Eudora or Thunderbird is the traditional approach. The advantage of such programs is that they are rich in features compared with Web-based mail and are preferred by many users. Their disadvantage is that e-mail access is tied to the machine the software is installed in. To retrieve e-mail from another computer, one has to install the mail client in that computer and set up the program all over again with user data and the address of the ISP's mail server.

**Web-based E–Mail**

Web-based e-mail has two major advantages. First, messages can be read and sent from any Web browser in the world by accessing the e-mail site and logging in with

---

thus comparable, from the readers' viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services.
(Footnote omitted).

**2.** PC Magazine's Online Encyclopedia of Internet Technology terms will be cited, hereinafter, as PCMag.com, with the term being defined in quotation marks. *E.g.* PCMag.com, "username."

username and password. Even if a client e-mail program is the preferred retrieval method, Web-based e-mail provides a convenient alternate when traveling without the computer. Secondly, a person can keep their Web-based e-mail address no matter how many times they switch ISPs for Internet access. If users do not have Web-based e-mail, they typically use their ISP's mail server. If they switch to a different ISP, they must notify everyone that me@oldISP. com has been changed to me@newISP.com, because most ISPs do not forward mail.

*Id.,* "Internet e-mail service." "Instant Messaging" (IM) is similar to e-mails, in that it is used for the exchange of text or attachments with a specific individual or individuals, but unlike e-mails, IM offers real-time communication—where the message appears to the other user immediately after the first user presses *send:*

> [Instant messaging is] [e]xchanging text messages in real time between two or more people logged into a particular instant messaging (IM) service. Instant messaging is more interactive than e-mail because messages are sent immediately, whereas e-mail messages can be queued up in a mail server for seconds or minutes. However, there are no elaborate page layout options in instant messaging as there are with e-mail. The IM text box is short, and pressing the enter key often sends the text. IM is designed for fast text interaction.

> Instant messaging services may also provide videophoning, file sharing, PC–to–PC voice calling and PC-to-regular-phone calling. Instant messaging has promoted IP telephony because the IM software makes it easy to switch from "text chat" to "voice chat," providing the user has a headset or microphone and speakers.

*Id.,* "Instant Messaging."

Blogs, chatrooms and discussion forums constitute a different category of Internet communications, in which users often post statements to the world at large without specification. The word *blog,* used as a noun, is a contraction of the words *Web* and *Log* and generally describes a site that "contains

dated text entries in reverse chronological order (most recent first) about a particular topic." *Id.*, "blog." A blog can serve as an online newsletter or as a personal journal—where an individual can post concerns, ideas, opinions, etc.—and it can contain links to web sites or can use images or video.[3] *Id.* More recently, the noun *blog* has been used as a verb, *to blog*, which means to publish an entry on a website that uses the reverse chronological "blog" format. *Id.*

A chatroom is another form of real-time communication over the Internet and constitutes a website that is set up to handle a group discussion.[4] Usually, chatroom participants know the other members only by their online username; after participants type, then press send, the statements are posted immediately and can viewed by other chatroom participants. The statements appear in reverse chronological order or "blog" format, and the string of statements forming the chatroom conversation is referred to as a discussion thread.[5]

---

**3.** Social networking sites and blogs are sophisticated tools of communication where the user voluntarily provides information that the user wants to share with others. Web sites such as Facebook and Myspace, allow the user to tightly control the dissemination of that information. The user can choose what information to provide or can choose not to provide information. The act of posting information on a social networking site, without the poster limiting access to that information, makes whatever is posted available to the world at large.

**4.** PC Magazine's Online Encyclopedia defines *chatroom* accordingly:
An interactive, online discussion (by keyboard) about a specific topic that is hosted on the Internet or on a BBS. On the Internet, chat rooms are available from major services such as AOL, individual Web sites and the Internet Relay Chat (IRC) system, the Net's traditional computer conferencing.
Chat rooms are set up to handle group discussions, and everyone sees what everyone else types in, although two people can decide to break off and have their own keyboard chat. "Instant messaging," a similar concept, works in an opposite manner. With instant messaging, two people normally interact back and forth and must specifically invite others to join in.
*Id.*, "chatroom."

**5.** A discussion thread or threaded discussion is "a running commentary of messages between two or more people in a discussion group." *Id.*, "threaded discussion."

An Internet forum is similar to a chatroom, in that many people participate in the same discussion, but the statements are posted to a website that is viewable from the World Wide Web, and responses are made over time rather than immediately in real-time. A common example of an Internet forum can be found on newspaper websites, where readers are invited to respond by "blogging" their responses to an article. Here, the article serves as the conversation topic that begins the discussion thread, and the discussion thread flows therefrom. An Internet forum is the context of the present case.

## Anonymity on the Internet

Since the early 1990's, when Internet communications became available to the American public, anonymity or pseudonymity has been a part of the Internet culture. Generally, first exposure to communications on the Internet was through the use of a dial-up online access providers,[6] such as America Online ("AOL") or Prodigy. These online access providers permitted subscribers to choose "screen names" to represent their online identities. When users logged-on using their screen names, they reached a home page presenting them with a host of communications services—from e-mail to chatrooms to instant messaging to forums—all of which were provided by the online access provider and all of which were accessed by using the online access provider's screen name. Thus, for example, under the AOL regime, an account held by John Smith might have had the screen name/log-in of "Jsmith1417," the e-mail address of "Jsmith1417@aol.com," and any statement posted in a chatroom, during an instant message exchange or in a forum, would be posted under the screen name "Jsmith1417." Under this configuration, subscribers enjoyed a degree of anonymity, because they were

---

6. An Internet Service Provider is "[a]n organization that provides access to the Internet. Connection to the user is provided via dial-up, ISDN, cable, DSL and T1 /T3 lines. Customers are generally billed a fixed rate per month, but other charges may apply." *Id.*, "Internet Service Provider." In early days of the Internet, "ISPs, such as AOL (America Online) ... provide[d] proprietary databases, forums and services in addition to the on-ramp to the Internet." *Id.*

permitted to use a screen name wholly distinct from their real name, but their screen names also were easily traceable, because they were linked to an Internet access account.

Full-service online access providers, like AOL or Prodigy, presently no longer dominate the Internet communications market, and at-home access to the Internet is often achieved through broadband services,[7] provided by local cable or phone companies. These broadband companies, unlike former online access providers, usually do not require the registration of a screen name and generally provide Internet access without any other services.[8] Most communications services, moreover, such as those that provide e-mail, instant messaging, chat-rooms or forums, are accomplished through a website hosted by a third-party on the World Wide Web. Thus, today, the hypothetical Internet user John Smith might gain access to the Internet through his local cable company, might obtain the e-mail address JSmith1747 over the World Wide Web through Google's "gmail," or a like service, and might participate in an Internet forum regarding a topic of interest under the regis-

---

**7.** Broadband has been defined as:

(1) High-speed transmission. The term commonly refers to Internet access via cable and DSL, which is as much as 400 times faster than analog dial-up. The term has always referred to a higher-speed connection, but the speed threshold varies with the times. Widely employed in companies, the 1.5 Mbps T1 line was often considered the starting point for broadband speeds, while the FCC defines broadband as a minimum upload speed of 200 Kbps.
*Id.* "broadband."

**8.** Broadband Internet access is growing rapidly in the United States. In 2007 47% of adult Americans paid extra each month to receive broadband access to the Internet, and in 2008, this number grew to 55%. John B. Horrigan, *Home Broadband Adoption 2008*, Pew Internet and American Life Project, at 1 (July 2008), *available at* http://www.pewinternet.org/pdfs/PIP_Broadband_2008.pdf (last visited Feb. 19, 2009). Only 10% of Americans now use dial-up to access the Internet. *Id.*

The diversity of activities for which Americans use Internet services is also growing. According to the Pew Report, in 2008, 49% of Internet users used an online search engine in a typical day, 13% used the Internet to send instant messages, 11% accessed the Internet to read an online blog and 5% accessed the Internet to create their own online blog. *Id.* at 19.

tered username "crazyCOAcommentator." When registering for this forum, John Smith might even obfuscate his true identity, making it even more difficult to trace his statements to him. In short, unlike former days when a user's posts were easily traceable through the online access provider's billing records, today, the World Wide Web host of an e-mail, instant messaging, forum or chatroom service obtains only as much information about an individual as it requires for registration, and even then, there are few checks to ensure the validity and accuracy of that information.

### First Amendment Protection of Anonymous Internet Speech

 "The command of the first amendment, that '[c]ongress shall make no law ... abridging the freedom of speech,' is directed with equal force, by way of the fourteenth amendment, to state and local governments." [9] *Eanes v. State*, 318 Md. 436, 445, 569 A.2d 604, 608 (1990), citing *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). This " 'constitutional right of free expression' puts 'the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.' " *Id.* at 445, 569 A.2d at 608, quoting *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787–1788,

---

9. Article 2 of the Maryland Declaration of Rights, furthermore, states:
 The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, and all Treaties made, or which shall be made, under the authority of the United States, are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding.
 Article 40 of the Maryland Declaration of Rights also provides, "[t]hat the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

29 L.Ed.2d 284, 293 (1971). The " 'freedom to think as you will and to speak as you think' is a 'means indispensable to the discovery and spread of political truth' and is essential both to 'stable government' and to 'political change.' " *Id.* at 445–46, 569 A.2d at 608, quoting *Whitney v. California,* 274 U.S. 357, 375–377, 47 S.Ct. 641, 648–649, 71 L.Ed. 1095, 1105–1106 (1927) (Brandeis & Holmes, JJ., concurring), overruled by *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). It has been described as " 'the Constitution's most majestic guarantee....' " *Eanes,* 318 Md. at 446, 569 A.2d at 608, quoting Laurence H. Tribe, American Constitutional Law § 12–1, at 785 (2d ed.1988).

■ Included within the panoply of protections that the First Amendment provides is the right of an individual to speak anonymously. *See Watchtower Bible & Tract Soc. of N.Y., Inc. v. Vill. of Stratton,* 536 U.S. 150, 166, 122 S.Ct. 2080, 2089, 153 L.Ed.2d 205, 219 (2002); *Buckley v. Am. Constitutional Law Found., Inc.,* 525 U.S. 182, 199–200, 119 S.Ct. 636, 646, 142 L.Ed.2d 599, 614 (1999); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341–42, 115 S.Ct. 1511, 1516, 131 L.Ed.2d 426, 436 (1995); *Talley v. California,* 362 U.S. 60, 64, 80 S.Ct. 536, 538, 4 L.Ed.2d 559, 563 (1960). In *McIntyre,* 514 U.S. at 341–42, 115 S.Ct. at 1516, 131 L.Ed.2d at 436, Justice John Paul Stevens, speaking on behalf of the United States Supreme Court, remarked on the importance of protecting anonymous or pseudonymous speech:

Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Great works of literature have frequently been produced by authors writing under assumed names. Despite readers' curiosity and the public's interest in identifying the creator of a work of art, an author generally is free to decide whether or not to disclose his or her true identity. The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be, at least in the field of literary endeavor, the interest in

having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry. Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.

(Citations and footnotes omitted). We also have acknowledged the magnitude of the protection of anonymous speech under the First Amendment. In *Lubin v. Agora, Inc.*, 389 Md. 1, 22, 882 A.2d 833, 846 (2005), for example, we denied the enforcement of subpoenas that would have compelled a publisher to disclose the identities of subscribers to their materials, holding, in part, that the subscriber's anonymity was protected under the First Amendment: [10]

To the extent that the Commissioner's subpoenas require Agora, a publisher, to disclose the identities of those who subscribe to or purchase its materials, the subpoenas seek information within the protective umbrella of the First Amendment. Enforcement of the subpoenas would intrude upon the First Amendment rights of Agora's subscribers and customers because disclosure of their subscriber status and purchase of the Report would destroy the anonymity that the Supreme Court has recognized as important to the unfettered exercise of First Amendment freedoms. If the names of Agora's readers were disclosed to the government, they might be subjected to questioning from investigators about their reading habits. Agora's subscribers may be discouraged from reading its materials if they are interviewed by government personnel investigating potential se-

---

**10.** Because the speech was deemed protected, we required the commissioner to "establish a substantial relation between the information sought and an overriding and compelling State interest," in compelling the production of the subscriber's identities. *Lubin v. Agora, Inc.*, 389 Md. 1, 23, 882 A.2d 833, 846–47 (2005). We found that no such nexus existed and denied the order compelling disclosure. *Id.*

curities violations, even if the readers are told that, individually, they are not under investigation.

(Footnote omitted).

■ The anonymity of speech, however, is not absolute and may be limited by defamation considerations. *Beauharnais v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919, 932 (1952) ("Libelous utterances [are] not ... within the area of constitutionally protected speech...."). *See Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942) (recognizing that defamatory and libelous speech "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality").

With respect to the Internet, the Supreme Court has noted that there is, "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Reno v. ACLU,* 521 U.S. at 870, 117 S.Ct. at 2344, 138 L.Ed.2d at 897. Courts and commentators alike have emphasized the importance of extending free speech protections to the Internet, recognizing the Internet as capable of "democratizing" the very "nature of public discourse," *Doe v. Cahill,* 884 A.2d 451, 455 (Del.2005), by permitting anyone with a computer to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. ACLU,* 521 U.S. at 870, 117 S.Ct. at 2344, 138 L.Ed.2d at 897. *See also* Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Disclosure in Cyberspace,* 49 Duke L.J. 855, 894–95 (2000) ("One of the most significant ways in which the Internet promises to change the nature of public discourse is by allowing more participants to engage in public discussion and debate. The Internet gives citizens inexpensive access to a medium of mass communication and therefore transforms every citizen into a potential "publisher" of information for First Amendment purposes." (Footnotes omitted)). Predictably, then, protections under the First Amendment have been extended to the Internet by various federal courts and courts in our sister

states. *See, e.g., Sony Music Entm't Inc. v. Does 1–40,* 326 F.Supp.2d 556, 562 (S.D.N.Y.2004); *Doe v. 2TheMart.com, Inc.,* 140 F.Supp.2d 1088, 1092 (W.D.Wash.2001); *Cahill,* 884 A.2d at 456; *Dendrite Int'l, Inc. v. John Doe No. 3,* 342 N.J.Super. 134, 775 A.2d 756, 760–61 (App.Div.2001).

## II. Facts and Procedural History

On May 26, 2006, Zebulon J. Brodie, appellee, filed a two-count complaint in the Circuit Court for Queen Anne's County, alleging defamation and conspiracy to defame against Independent Newspapers, Inc., and three John Doe defendants known only by their usernames "CorsicaRiver," "Born & amp; Raised Here" and "chatdusoleil." The specific allegations of Count I, defamation, were: [11]

8. In March, 2006, the Defendants' Doe transmitted text to the Publication, directed to those in the Queen Anne's County area, with the intent that it be published over the Internet. The text accused the Plaintiff, among other things, of maintaining "dirty and unsanitary-looking food-service places" and allowing trash from those establishments to "waft" into the nearby waterway.

9. Independent, via the Publication, in fact did publish the aforementioned text to the general public.

10. In March, 2006, the Defendants' Doe transmitted text to the Publication, directed to those in Queen Anne's County area, with the intent that it be published over the Internet. The text specifically accused the Plaintiff, with regard to an historical home known as the "Charles Cahall Farm," of getting "away with torching it," and having no "sense of decency." Further, the registered members stated:

. . . there must be a special circle in Hell reserved for a selfish developer who deliberately burns down a beautiful Civil War house, after cutting down all the 100–year–old

---

**11.** Paragraphs 1–7 primarily discussed facts relevant to jurisdiction, linked Independent Newspapers to the web-based forum Newszap.com and stated that Independent Newspapers maintained identifying information about its registered users.

trees around it. A really hot circle of Hell, where they do nasty things to you with nail guns and hot asphalt.

11. Independent, via the Publication, in fact did publish the aforementioned text to the general public.

12. These aforementioned statements are defamatory *per se* in that they tend to, and in fact did, injure the Plaintiff in his profession and employment.

13. The Defendants knowingly made and published the aforementioned defamatory statements.

14. Alternatively, the Defendants negligently made and published the aforementioned defamatory statements.

15. The Defendants published the aforementioned false and defamatory statements to the Queen Anne's County area, the residents of which understood the publications to be false and defamatory.

16. The Defendants acted with knowledge of the falsity of the statements and with the intent to harm Plaintiff's profession and employment.

17. As a result of the publication of the aforementioned defamatory statements, the professional character and reputation of the Plaintiff in the community of Queen Anne's County were impaired, and he suffered mental anguish and personal humiliation.

18. As a direct and proximate result of the aforementioned false and defamatory publications, the Plaintiff suffered a loss of prospective income.

Brodie also included a count of civil conspiracy to defame, alleging the following:

19. The Defendants, and each of them, entered into an agreement with each other, whereby the Defendants would produce the aforementioned defamatory statements about the Plaintiff and publish those statements to the general public in Queen Anne's County, Maryland.

20. The aforementioned statements were in fact published to the general public in Queen Anne's County, Maryland.

21. As a direct and proximate result of the Defendants' conspiracy to defame the Plaintiff, the Plaintiff has suffered damages to his personal reputation and standing in the community, as well as certain mental anguish and humiliation, all of which affect his profession and employment in Queen Anne's County, Maryland.

Independent Newspapers filed a motion to dismiss or in the alternative for summary judgment, arguing that it was immune from suit under the federal Communications and Decency Act, 47 U.S.C. § 230 (2000), that the comments regarding the burning of the house were not of and concerning Brodie, because they implicated the developer to whom Brodie sold his home, and that "the challenged statements [were] non-actionable opinion." Independent Newspapers also asserted that the claim for civil conspiracy had to be dismissed, again, asserting immunity, and also arguing that there was no underlying tort of defamation nor any evidence of an agreement to defame.

In support, Independent Newspapers submitted a copy of the Tuesday March 14, 2006, "Centreville Eyesores" discussion thread,[12] in which the burning of Brodie's former home was discussed:

**CorsicaRiver:** I think there must be a special circle in Hell reserved for a greedy selfish developer who deliberately burns down a beautiful pre-Civil War house, after cutting down all the 100–year–old cypress trees around it. A really hot circle of Hell, where they do nasty things to you with nail guns and hot asphalt.

What I'm referring to is not in Centreville, but nearby in Church Hill. . . . The white Greek Revival house facing 213 that Zeb Brodie sold 3 months ago for $1.85 mil to developers, who deliberately torched it this past weekend. As of this morning, they were bulldozing the charred remnants. There goes another one of our County's historic landmarks,

---

12. The "Centreville Eyesores" discussion thread was the name of the Internet forum discussion hosted by Independent Newspapers on its website Newszap.com.

a sight that used to lift my spirits every time I past it on 213.

Shame on you Mr. Brodie!

**Born & amp; Raised Here:** Oh my God, they burned the place down? I can't believe it!!!!!! I heard Bill Sharp bought it from Brodie, don't know if that's true or not. Has anyone else heard the same thing?

**CorsicaRiver:** Yes, they burned it down ... and shame on Bill Sharp as well as Mr. Brodie!

I just found out some more information about the house. It was known as the Charles Cahall Farm and apparently dated back to the 1850s. In his 1980 historical sites survey, Orlando Ridout of the Maryland Historic Trust called it "one of the most carefully, preserved farmhouses in the country," "remarkable," and "virtually untouched." There were also a well-preserved meat house, windmill, and granary.

\* \* \*

**SecretAgentMan:** Bastards!

\* \* \*

**chatdusoleil:** Has there been a news story on the fire this weekend? Or an investigation?

(Ellipses in original). Independent Newspapers also submitted the affidavit of Tammy Brittingham, President of Independent Newspapers, who defined the operation of Independent Newspapers' Internet discussion forum via its website "Newszap.com," and submitted a copy of the "Policies and Disclaimers" for using its website.[13]

---

13. The "Policies and Disclaimers" state, in pertinent part:

MEMBERSHIP AND REGISTRATION AGREEMENT: By registering as a user of newszap.com, you agree that the information you provide to us, including the personally identifying information, is true and accurate. You accept responsibility for all activities that occur under your account or password, and agree not to sell, transfer or

Independent Newspapers also filed, on August 31, 2006, a motion for a protective order, and memorandum in support thereof, to "shield[ ] it" from being compelled to identify "CorsicaRiver," "Born & amp; Raised Here" and "chatduso-leil," arguing, both as a discovery matter,[14] and as a matter involving the First Amendment, that Brodie should be required to make a legal and evidentiary showing that he had a

---

assign your user rights. We reserve the right to terminate your use at any time for any reasons. . . .

POSTED CONTENT: All postings posted on or linked from the site, including uploaded files, PDFs and other documents and materials, are the sole responsibility of the person or entity from whom the content originated. We do not vouch for or warrant the accuracy, completeness or usefulness of any message, posting, linked material, photo or any content placed here by users of this site.

By registering with this site, you agree: that you are solely responsible for the content of your postings, uploads and/or links; and that you indemnify and hold harmless these forums and all their agents and employees with respect to any claim based upon the appearance and/or transmission of your postings, uploads and/or links or any other material you cause to appear on this site.

\* \* \*

PRIVATE POLICY: While we preserve one's right to anonymity on the forum pages, we do require each individual to register a user name, email address and password. This protects newszap.com AND the individual from false representations. Individuals posting libelous or defamatory comments are not welcome at this site and are granted no right to anonymity should a court of law seek a poster's identity.

When you visit *newszap.com* to read or download information, our web servers collect and store only such data as your domain name, the date and time you access this site, and the Internet address of the web site from which you linked to this site. . . .

(Emboldening and underlining in original).

14. In both its Motion to Dismiss or, in the Alternative, for Summary Judgment, and in its Reply to Plaintiff's Response to Motion for Protective Order, Independent Newspapers asserted:

Plaintiff has had numerous opportunities to state his defamation claim properly and with sufficient particularity. Nevertheless, plaintiff *still* has not provided the complete allegedly defamatory statements in context or linked the statements to particular speakers, and the statements—insofar as Independent Newspapers can evaluate them given plaintiff's insufficient pleadings—are not "of and concerning" plaintiff, and are, at best, non-actionable opinion.

(emphasis in original)

valid cause of action before being permitted to discover identifying information regarding the forum participants.

In an order dated November 21, 2006, the circuit court judge dismissed Independent Newspapers from the case, ruling that because Independent Newspapers was an "interactive computer service" and the Doe defendants were "information content provider[s]," [15] the newspaper could not be sued as the publisher of the statements under the federal Communications and Decency Act, 47 U.S.C. § 230(c)(1) (2000) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider").[16] The judge, nevertheless, in the same order, compelled Independent Newspapers to comply with the Brodie subpoena and reveal identifying information regarding "CorsicaRiver," "Born & amp; Raised Here" and "chatdusoleil" from its records. Independent Newspapers immediately moved for reconsideration of the order enforcing the subpoena, arguing that the circuit court judge implicitly assumed that the statements posted by "CorsicaRiver," "Born & amp; Raised Here" and "chatduso-

---

**15.** The federal Communications and Decency Act defines "interactive computer service" and "information content provider" accordingly:

**(2) Interactive computer service**
The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(2) Information content provider**
The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

47 U.S.C. § 230, (f)(2)-(f)(3) (2000).

**16.** In reaching this conclusion, the judge reviewed the three elements necessary for the act to apply, as set forth in *DiMeo v. Max*, 433 F.Supp.2d 523, 529 (E.D.Pa.2006):(1) that they qualify as a "provider or user of an 'interactive computer service' "; (2) that the asserted claims treat them "as a publisher or speaker of information"; and (3) that the challenged communication was "information provided by another information content provider."

leil" were actionable, without requiring any showing that Brodie had a valid cause of action.

In an order and opinion dated March 12, 2007, the judge granted Independent Newspapers' motion for reconsideration in part and denied it in part; he "agree[d] with [Independent Newspapers] that, no matter what standard [he] utilize[d] in deciding whether or not to grant their motion for a protecti[ve] order, the piety of the First Amendment requires ensuring that Plaintiff has stated a valid claim of defamation," and therefore, dismissed the cause of action premised on the statements regarding the burning of Brodie's former home, because the statements referred to the developer to whom Brodie sold the home, not to Brodie. With respect to the March 17 to 21, 2006, statements related to Brodie's food establishments, however, the judge ordered Independent Newspapers to comply with the Brodie subpoena:

ORDERED, that the Motion for Reconsideration is GRANTED in part; and it is

ORDERED, that the requested protective order is denied as to statements regarding Plaintiff's businesses to the extent providing available discovery regarding the identity of those individuals who made statements that the Plaintiff's food service business was maintained in a "dirty and unsanitary-looking" manner, and was permitting trash from the business to pollute the nearby waterway.

ORDERED that the protective order is granted as to all other related discovery. . . .

Subsequent to the judge's order, Independent Newspapers requested the specific allegations of defamation related to the food-service establishment, and Brodie's counsel responded with a letter, reflecting that the "posters" responsible for the statements about the food establishment were actually "RockyRacoonMD" and "Suze": "It seems, from my reading of the enclosure, that the identifiable 'posters' are **_RockyRacoonMD_** and **_Suze._**" (Emboldening and italics in original). With the letter, he also enclosed a copy of the discussion thread, parts

of which allegedly were relevant to the food establishment claim:

**KidWellToo:** Posted: Tue Mar 21st, 2006 06:23 am

> **RockyRaccoonMD wrote:** I wouldn't go to that Dunkin' Donuts ... anyway ... have you taken a close look at it lately? One ... most dirty and unsanitary-looking food-service places I ... seen.

Just an FYI, you can complete a customer satisfaction report on the Dunkin' Donuts website .... make a difference, but it's a start. Perhaps the corporate folks will insist on a clean-up effort ... we can all go back some day.

**Suze:** Posted: Mon Mar 20th, 2006 05:13pm

Corsica—I haven't seen the inside of a DD in a while, but have you seen the outside? I drove th ... through not long ago and was completely and utterly SHOCKED at the amount of trash that is ... and sides of that building. It's apparent no one is cleaning the outside oft he building and the ... wafting into the river that runs right alongside.[smiley face]

If they don't keep the outside clean then .... hmm ... makes you wonder

**CorsicaRiver:** Posted: Mon Mar 20th, 2006 04:52 pm

**RockyRaccoonMD wrote:**

> Remember Mr. Brodie owns Dunkin' Donuts in town. He ... the corner of the shop every morning. I think I will mak ... trip there this week and let him know what I think and ... foot into that business, or any others that he owns (whi ... includes Subway), ever again. I'm sure it will not m ... much of a difference but ...

I wouldn't go to that Dunkin' Donuts of Brodie's anyway ... taken a close look at it lately? One of the most dirty and ... looking food-service places I have seen ... I bought coffee ... couple of times but quickly lost my appetite....

* * *

**Born & amp; Raised Here:** Posted: Sat Mar 18th, 2006 06:16am

**chatdusoleil wrote:**

**RockyRaccoonMD wrote:**

Remember Mr. Brodie owns Dunkin' Donuts in town. He ... the corner of the shop every morning. I think I will mak ... trip there this week and let him know what I think and ... foot into that business, or any others that he owns (whi ... includes Subway), ever again. I'm sure it will not m ... much of a difference but ...

[smiley face]

Hmmm, interesting. Thanks for posting this, C

\* \* \*

**chatdusoleil:** Posted: Fri Mar 17th, 2006 07:34 pm

**RockyRaccoonMD wrote:**

Remember Mr. Brodie owns Dunkin' Donuts in town. He ... the corner of the shop every morning. I think I will mak ... trip there this week and let him know what I think and ... foot into that business, or any others that he owns (whi ... includes Subway), ever again. I'm sure it will not m ... much of a difference but ...

[smiley face]

[End of Record [17]]

Thereafter, Brodie served Independent Newspapers with another subpoena, ordering discovery of "any and all documents and tangible things identifying and/or relating to ... "CorsicaRiver," "Born & amp; Raised Here," "chatdusoleil," "RockyRaccoonMD" and "Suze." Independent Newspapers responded by filing a motion to quash and/or for a protective order, and memorandum in support thereof, arguing primarily that anonymity should be maintained, because Brodie failed to assert an actionable claim for defamation. In an order dated February 19, 2008, the judge denied Independent Newspapers' motion and ordered it to comply with the subpoena within 30 days. Independent Newspapers filed a Notice of

---

**17.** Ellipses were added when words were cut off at the right hand side of the page; ellipses without spaces appeared, as such, in original.

Appeal, and this Court granted certiorari prior to any proceedings in the Court of Special Appeals.

## III. Discussion

We are presented with whether the judge properly denied Independent Newspapers' motion for a protective order/motion to quash, regarding the subpoena compelling Independent Newspapers to identify "CorsicaRiver," "Born & amp; Raised Here," "chatdusoleil," "RockyRaccoonMD" and "Suze." Independent Newspapers argues that Brodie should have been required to make at least some showing of a viable defamation cause of action before the judge ordered the identification of the anonymous posters. Brodie contends that the judge was correct in ordering the identification of the five posters.

We shall hold that the circuit court judge abused his discretion when he denied Independent Newspapers' motion for a protective order, because when he compelled the identification of the five Does, Brodie had not pleaded a valid defamation claim against any of them. Because we did not take this issue just to sort out the record but to give guidance to trial courts addressing similar matters, we shall then discuss what standard to employ, when balancing an individual's First Amendment right to speak anonymously on the Internet against a plaintiff's right to seek judicial redress for defamation.

### A.

■ We review a discovery order under "the abuse of discretion standard and will only conclude that the trial court abused its discretion where no reasonable person would take the view adopted by the [trial] court [ ] . . . or when the court acts without reference to any guiding principles, and the ruling under consideration is clearly against the logic and effect of facts and inferences before the court[ ] . . . or when the ruling is violative of fact and logic." *Beyond Systems*, 388 Md. at 28, 878 A.2d at 583–84 (internal quotations omitted) (alterations in original).

██ A "defamatory statement," is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Offen v. Brenner*, 402 Md. 191, 198–99, 935 A.2d 719, 724 (2007) (internal citations omitted). The statute of limitations in a defamation action is one year. Maryland Code (1974, 2002 Repl.Vol.), Section 5–105 of the Courts and Judicial Proceedings Article.[18]

██ We have retained the common law distinction between defamation per se and defamation per quod, which was described by Judge Marvin H. Smith, writing for a unanimous Court, in *Metromedia, Inc. v. Hillman*, 285 Md. 161, 172–73, 400 A.2d 1117, 1123 (1979), as:

> [T]he only distinction remaining in Maryland between a libel per se and a libel per quod is that to recover the plaintiff must first show that the publication is defamatory. Where the words themselves impute the defamatory character [per se], no innuendo—no allegation or proof of extrinsic facts— is necessary; but otherwise, it is [per quod]. This is both a pleading rule and an evidentiary requirement. Where extrinsic facts must be shown in order to establish the defamatory character of the words sued upon, the omission to plead them makes the complaint demurrable for failure to state a cause of action. Failure to prove them would justify a directed verdict.

To establish a prima facie case of defamation, then, the plaintiff must show: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 402 Md. at 198, 935 A.2d 719 at 723–24. In the case of defamation per quod, extrinsic facts must be

---

**18.** Section 5–105 of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2002 Repl.Vol.), entitled, "Assault, libel or slander," states, "[a]n action for assault, libel, or slander shall be filed within one year from the date it accrues."

alleged in the complaint to establish the defamatory character of the words or conduct. *See M & S Furniture Sales Co., Inc. v. Edward J. De Bartolo Corp.,* 249 Md. 540, 544, 241 A.2d 126, 128 (1968) (stating that the "injurious effect [of the words or conduct] must be established by allegations and proof of special damage and in such cases it is not only necessary to plead and show that the words or actions were defamatory, but it must also appear that such words or conduct caused actual damage").

■■■ Here, we are presented with a discovery order, compelling the identification of five anonymous defendants, "CorsicaRiver," "Born & amp; Raised Here," "chatdusoleil," "RockyRaccoonMD" and "Suze," based on a complaint alleging defamation. The complaint identified "CorsicaRiver," "Born & amp; Raised Here," and "chatdusoleil" as defendants and alleged two instances of defamation, the first involving comments made on March 14, 2006, regarding the burning of Brodie's former home by the buyer, and the second involving allegations that Brodie maintained "dirty and unsanitary-looking food-service places" and that he "allow[ed] trash from those establishments to 'waft' into the nearby waterway"—statements that were made on Independent Newspapers' website between March 17 and 21, 2006. "RockyRaccoonMD" and "Suze" were not named as defendants.

In his final order, the judge dismissed Brodie's cause of action regarding the burned house, because the alleged defamation did not involve Brodie; hence, the cause of action against "CorsicaRiver," "Born & amp; Raised Here" and "chatdusoleil" no longer existed, and their identity could not be compelled. Brodie also had alleged a defamation cause of action with regard to statements involving his "mainten[ance of] 'dirty' and unsanitary-looking food-service places" and that he "allow[ed] trash from those establishments to 'waft' into the nearby waterway," but conceded in correspondence in the trial court proceedings, and later in oral argument before this Court, that the identifiable posters of these statements were "RockyRaccoonMD" and "Suze." Enclosed with the written correspondence in the trial court, which identified "RockyRac-

coonMD" and "Suze" as the posters of these statements, was the forum discussion thread from the Newszap.com website. *See supra*, at 23–25.

 Brodie, however, did not sue "RockyRaccoonMD" or "Suze" in his complaint, nor did he timely amend it to add the two posters. The cause of action against "RockyRacoonMD" and "Suze" was barred by the statute of limitations at the time the trial court ordered disclosure of their identities; thus, their identities could not be compelled. *See Crowe v. House-worth*, 272 Md. 481, 486, 325 A.2d 592, 595 (1974) ("[R]elation back will not be permitted when a new defendant is added...."). When the judge compelled discovery of the identities of "CorsicaRiver," "Born & amp; Raised Here," "chatdusoleil," "RockyRaccoonMD" and "Suze," Brodie did not have a valid cause of action for defamation, so that Independent Newspapers' motion to quash/motion for a protective order should have been granted.

## B.

 We granted certiorari in this case not merely to sort out the record, but to provide guidance to the trial courts in defamation actions, when the disclosure of the identity of an anonymous Internet communicant is sought. In so doing, we recognize the complexity of the decision to order disclosure regarding pseudonyms or usernames in the context of the First Amendment and a defamation allegation. On the one hand, posters have a First Amendment right to retain their anonymity and not to be subject to frivolous suits for defamation brought solely to unmask their identity. *See Cahill*, 884 A.2d at 457 (The " 'sue first, ask questions later' approach, coupled with a standard only minimally protective of the anonymity of defendants, will discourage debate on important issues of public concern as more and more anonymous posters censor their online statements in response to the likelihood of being unmasked."); Lidsky, *supra*, 49 Duke L.J. at 855 ("[t]hese suits threaten to suppress legitimate criticism....").

On the other, viable causes of actions for defamation should not be barred in the Internet context.

The only other state supreme court to address, in a civil law context, disclosure of usernames in an Internet forum is Delaware, in *Doe v. Cahill*, 884 A.2d 451 (Del.2005). Cahill was an elected town council member who, with his wife, sued pseudonym/username "Proud Citizen" for defamation and invasion of privacy regarding allegedly defamatory posts made on an Internet blog, the "Smyrna/Clayton Issues Blog," hosted by the Delaware State News. The Cahills subpoenaed Comcast Corporation to discover the identity of "Proud Citizen," because Comcast, as the Internet Service Provider, allegedly had knowledge of identifying information. Comcast, in compliance with federal statute,[19] notified "Proud Citizen" of the subpoena, and "Proud Citizen" filed an Emergency Motion for Protective Order. The trial judge determined that a "good faith" standard provided the appropriate threshold and required the Cahills to establish, "(1) that they had a legitimate, good faith basis upon which to bring the underlying claim; (2) that the identifying information sought was directly and materially related to their claim; and (3) that the information could not be obtained from any other source." *Id.* at 455. Finding that the Cahills had met these factors, the judge denied the protective order.

"Proud Citizen" appealed the denial of the protective order, arguing a mere "good faith" assertion of a claim of defamation inadequately protected the First Amendment right to speak anonymously on the Internet. The Delaware Supreme Court agreed, ruling that the appropriate standard was to evaluate the defamation allegations under a summary judgment standard:[20]

---

**19.** 47 U.S.C. § 551(c)(2) (2000) states that a cable operator may disclose personally identifiable information if "made pursuant to a court order authorizing such disclosure, if the subscriber is notified of such order by the person to whom the order is directed."

**20.** Rule 56(c) of the Rules of Civil Procedure for the Superior Court of the State of Delaware governs summary judgments and states, in pertinent part:

We conclude that the summary judgment standard is the appropriate test by which to strike the balance between a defamation plaintiff's right to protect his reputation and a defendant's right to exercise free speech anonymously. We accordingly hold that before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process he must support his defamation claim with facts sufficient to defeat a summary judgment motion.

*Id.* at 460. The court also stated that before the plaintiff could obtain identifiable information about the anonymous poster, the plaintiff must notify the poster in a way that provides the poster with a reasonable opportunity to oppose the discovery request.

We retain the notification provision in the *Dendrite* test.[21] Thus, to the extent reasonably practicable under the circumstances, the plaintiff must undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for order of disclosure. The plaintiff must also withhold action to afford the anonymous defendant a reasonable opportunity to file and serve opposition to the discovery request. Moreover, when a case arises in the internet context, the plaintiff must post a message notifying the anonymous defendant of the plaintiff's discovery request on the same message board where the allegedly defamatory statement was originally posted.

---

(c) *Motion and Proceedings Thereon.* The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

21. *Dendrite* refers to the New Jersey intermediate appellate court case *Dendrite Int'l v. Doe*, 342 N.J.Super. 134, 775 A.2d 756 (App.Div.2001), which shall be discussed *infra*.

*Id.* at 460–61 (footnote added). The requirement of notification to the poster, coupled with opportunity to defend, appears to be generally accepted in First Amendment cases; although, the issue of the standard to be utilized to assess the viability of the allegations of defamation differentiate the Delaware decision from many of the other courts that have considered the issue.

One federal district court ordered disclosure when the claimant could survive a motion to dismiss, having alleged sufficient facts to support a cause of action. In *Columbia Insurance Company v. seescandy.com*, 185 F.R.D. 573 (N.D.Cal.1999), Columbia Insurance Company, who, as the assignee of various trademarks related to the operation of See's Candy Shops, sought a restraining order and injunctive relief to inhibit the use of the domain name of "Seescandy.com," arguing that the website infringed upon a registered trademark, although Columbia had not discovered the identity of the registrar of the domain name with third-party Network Solutions, Inc. The court, in an attempt to balance First Amendment anonymity against the infringement claim, developed a four-part test:

First, the plaintiff should identify the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court. This requirement is necessary to ensure that federal requirements of jurisdiction and justiciability can be satisfied.

\* \* \*

Second, the party should identify all previous steps taken to locate the elusive defendant. This element is aimed at ensuring that plaintiffs make a good faith effort to comply with the requirements of service of process and specifically identifying defendants.

\* \* \*

Third, plaintiff should establish to the Court's satisfaction that plaintiff's suit against defendant could withstand a

motion to dismiss. A conclusory pleading will never be sufficient to satisfy this element. Pre-service discovery is akin to the process used during criminal investigations to obtain warrants. The requirement that the government show probable cause is, in part, a protection against the misuse of *ex parte* procedures to invade the privacy of one who has done no wrong. A similar requirement is necessary here to prevent abuse of this extraordinary application of the discovery process and to ensure that plaintiff has standing to pursue an action against defendant.

\* \* \*

Lastly, the plaintiff should file a request for discovery with the Court, along with a statement of reasons justifying the specific discovery requested as well as identification of a limited number of persons or entities on whom discovery process might be served and for which there is a reasonable likelihood that the discovery process will lead to identifying information about defendant that would make service of process possible.

*Id.* at 578–580 (citations omitted).

Another standard, perhaps the weakest, requires only that a plaintiff have a "good faith basis" for asserting a cause of action before permitting discovery of identifying information and has been implemented by a judge of the Circuit Court of Virginia in *In re Subpoena Duces Tecum to America Online, Inc.,* 52 Va. Cir. 26, 37 (2000) (hereinafter *"AOL"*), *rev'd on other grounds sub nom, America Online, Inc. v. Anonymous Publicly Traded Co.,* 261 Va. 350, 542 S.E.2d 377 (2001). In this case an anonymous entity sued John Doe in Indiana, alleging the publication of defamatory and confidential material in an AOL chatrooom. Because AOL's principal office was located in Virginia, discovery was moved to a Virginia state court. AOL, in support of its motion to quash discovery and/or for a protective order, argued that it should not have to reveal the names of the Doe defendants without sufficient proof of a prima facie case. After the court ordered the plaintiff to provide the specific comments made in the chat-

room, the judge ultimately denied AOL's motion for protective order, favoring a "good faith basis" test over a prima facie one:

Although this Court agrees with AOL that APTC must establish that there is a legitimate basis to believe that it may have *bona fide* claims against the John Does before compliance with the subpoena duces tecum is ordered, it agrees with APTC that AOL's proposed test is unduly cumbersome. What is sufficient to plead a prima facie case varies from state to state and, sometimes, from court to court. This Court is unwilling to establish any precedent that would support an argument that judges of one state could be required to determine the sufficiency of pleadings from another state when ruling on matters such as the instant motion.

\* \* \*

Therefore, in lieu of the test proposed by AOL, this Court holds that, when a subpoena is challenged under a rule akin to Virginia Supreme Court Rule 4:9(c), a court should only order a non-party, Internet service provider to provide information concerning the identity of a subscriber (1) when the court is satisfied by the pleadings or evidence supplied to that court (2) that the party requesting the subpoena has a legitimate, good faith basis to contend that it may be the victim of conduct actionable in the jurisdiction where suit was filed and (3) the subpoenaed identity information is centrally needed to advance that claim. A review of the Indiana pleadings and the subject Internet postings satisfies this Court that all three prongs of the above-stated test have been satisfied as to the identities of the subscribers utilizing the four e-mail addresses in question.

*AOL,* 52 Va. Cir. at 36–37 (citations omitted). *See also Doe v. 2TheMart.com,* 140 F.Supp.2d 1088, 1095 (W.D.Wash.2001) (granting plaintiff's motion to quash 2TheMart.com's subpoena, seeking to identify 23 anonymous Internet speakers, after considering whether "(1) the subpoena seeking the information was issued in good faith and not for any improper purpose, (2)

the information sought relates to a core claim or defense, (3) the identifying information is directly and materially relevant to that claim or defense, and (4) information sufficient to establish or to disprove that claim or defense is unavailable from any other source").

Finally, in *Dendrite International, Inc. v. Doe*, 342 N.J.Super. 134, 775 A.2d 756 (App.Div.2001), a three judge panel of the Superior Court of New Jersey, Appellate Division, opined that a plaintiff who seeks the identification of anonymous posters in a defamation action must establish facts sufficient to maintain a prima facie case, because "the discovery of [the speaker's] identity largely turns on whether his statements were defamatory or not," and "[a]ssuming [that the] statements are lawful, they would be afforded Constitutional protection." *Id.* at 760, 766. In *Dendrite*, Dendrite International, Inc., sued four Doe defendants for defamation, based, in part, on the posting of statements on a web site forum hosted by Yahoo!, regarding Dendrite's "revenue recognition policy," which was said to have inflated their earnings reports, and the "shopping" of the company. *Id.* at 763. The judge, after issuing an order to the Doe defendants to show cause why their identities should not be revealed and after conducting a hearing on the matter, granted Dendrite's motion to conduct limited discovery to ascertain the identities of Doe defendants one and two, but denied the motion with respect to defendants three and four. In so doing, the judge balanced individuals' right " 'to anonymously voice their opinions against a plaintiff's right to confront his accusers,' " and concluded, at least as to Doe three, that " 'Dendrite ha[d] not made a prima facie case of defamation against John Doe No. 3, as Dendrite ha[d] failed to demonstrate that it was harmed by any of the posted messages.' " *Id.* at 764. Dendrite immediately appealed the order denying discovery of Doe No. 3's identity.

In affirming, the New Jersey intermediate appellate court recognized that the prima facie standard was more onerous than the motion to dismiss standard, but noted:

Here, although Dendrite's defamation claims would survive a traditional motion to dismiss for failure to state a cause of

action, we conclude the motion judge appropriately reviewed Dendrite's claim with a level of scrutiny consistent with the procedures and standards we adopt here today and, therefore, the judge properly found Dendrite should not be permitted to conduct limited discovery aimed at disclosing John Doe No. 3's identity.

*Id.* at 771. The more rigorous standard was regarded as more appropriate in applying a balancing test between the First Amendment right to anonymity and actions for defamation:

> We offer the following guidelines to trial courts when faced with an application by a plaintiff for expedited discovery seeking an order compelling an [Internet Service Provider] to honor a subpoena and disclose the identity of anonymous Internet posters who are sued for allegedly violating the rights of individuals, corporations or businesses. The trial court must consider and decide those applications by striking a balance between the well-established First Amendment right to speak anonymously, and the right of the plaintiff to protect its proprietary interests and reputation through the assertion of recognizable claims based on the actionable conduct of the anonymous, fictitiously-named defendants.

*Id.* at 760. The three judge panel also, as have other courts, recognized that a claimant must provide notice to posters and provide them a reasonable opportunity to be heard, and must identify and set forth the exact statements purportedly made by each anonymous poster that constitutes actionable speech:

> We hold that when such an application is made, the trial court should first require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, and withhold action to afford the fictitiously-named defendants a reasonable opportunity to file and serve opposition to the application. These notification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the ISP's pertinent message board.

The court shall also require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster that plaintiff alleges constitutes actionable speech.

The complaint and all information provided to the court should be carefully reviewed to determine whether plaintiff has set forth a prima facie cause of action against the fictitiously-named anonymous defendants. In addition to establishing that its action can withstand a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to *R.* 4:6–2(f), the plaintiff must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis, prior to a court ordering the disclosure of the identity of the unnamed defendant.

*Id.* Once notice and an opportunity to be heard have been given, and a prima facie case has been shown, the trial judge must engage in a balancing test before granting a discovery order:

[T]he court must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed.

The application of these procedures and standards must be undertaken and analyzed on a case-by-case basis. The guiding principle is a result based on a meaningful analysis and a proper balancing of the equities and rights at issue.

*Id.* at 760–61.

The application of *Dendrite* has varied. In *Highfields Capital Management L.P. v. Doe,* 385 F.Supp.2d 969 (N.D.Cal.2005), a hedge fund management firm alleged defamation by a Doe defendant, based upon statements posted on a Yahoo! message board devoted to discussion of Silicon Graphics, Inc. (SGI), a company in which Highfields was the largest shareholder. In ruling that the magistrate judge had properly required the plaintiff to show a "real evidentiary basis" for believing that the defendant had engaged in "wrong-

ful conduct that has caused real harm," the district court judge approved of the magistrate judge's two-part test based on *Dendrite:*

■ [T]he plaintiff must adduce *competent evidence*—and the evidence plaintiff adduces must address *all* of the inferences of fact that plaintiff would need to prove in order to prevail under at least one of the causes of action plaintiff asserts. In other words, the evidence that plaintiff adduces must, if unrebutted, tend to support a finding of *each* fact that is essential to a given cause of action. The court may not enforce the subpoena if, under plaintiff's showing, any *essential* fact or finding lacks the requisite evidentiary support.

* * *

■ If reached, the second component of the test requires the court to assess and compare the magnitude of the harms that would be caused to the competing interests by a ruling in favor of plaintiff and by a ruling in favor of defendant. If, after such an assessment, the court concludes that enforcing the subpoena would cause relatively little harm to the defendant's First Amendment and privacy rights and that its issuance is necessary to enable plaintiff to protect against or remedy serious wrongs, the court would deny the motion to quash.

*Id.* at 975–76 (emphasis in original).

In *Mobilisa, Inc. v. Doe,* 217 Ariz. 103, 170 P.3d 712 (Ct.App.2007), a three judge panel of the Arizona intermediate appellate court implemented a hybrid of the *Cahill* and *Dendrite* standards. The dispute in *Mobilisa* arose when an anonymous e-mail address, literally named "theanonymousmail.com," (the "emailer") intercepted an intimate e-mail sent from the CEO of Mobilisa, Nelson Ludlow, to Shara Smith, a woman with whom Ludlow was involved in a personal relationship. *Id.* at 715. Mobilisa sued the emailer under two federal laws relating to electronic communications, 18 U.S.C. §§ 1030 & 2701 (2000), and common law trespass to chattel, and sought

to discover the true identity of the emailer from "The Suggestion Box, Inc.," (TSB) an Arizona e-mail service provider. The lower court, using the *Cahill* test, granted Mobilisa leave to discover the anonymous emailer's identity from TSB, and TSB appealed. A three judge panel of the Arizona Court of Appeals, after discussing both *Dendrite* and *Cahill,* adopted a hybrid of the two, requiring, that the plaintiff give adequate notice to the anonymous speaker and reasonable opportunity to respond to the discovery request; that the plaintiff provide sufficient facts to surpass the summary judgment threshold; and finally, that the trial judge balance "the strength of the requesting party's case against the need for disclosure of the anonymous poster's identity." *Id.* at 719–20.

In *Sony Music Entm't, Inc. v. Does 1–40,* 326 F.Supp.2d 556 (S.D.N.Y.2004), a United States District Court Judge for the Southern District of New York synthesized elements from *seescandy* and *Dendrite.* There, Sony brought a copyright infringement action against forty Doe defendants who, without Sony's permission, "used 'Fast Track,' an online media distribution system—or 'peer to peer' ('P2P') file copying network—to download, distribute to the public, or make available for distribution 'hundreds or thousands' of copyrighted sound recordings." *Id.* at 558. Sony had subpoenaed Cablevision, the Internet Service Provider of the 40 Does, for identifying information. After Cablevision notified the Does that it would comply with the subpoena unless they acted, the Does moved to quash.

The federal district court judge, after ruling that the Does' conduct was "speech" on the Internet, applied the following synthesis:

Cases evaluating subpoenas seeking identifying information from ISPs regarding subscribers who are parties to litigation have considered a variety of factors to weigh the need for disclosure against First Amendment interests. These factors include: (1) a concrete showing of a prima facie claim of actionable harm, *see seescandy.com,* 185 F.R.D. at 577, 579–81 (permitting plaintiff to request discovery, based on particular factors, to determine identities of defendants

known only by Internet pseudonyms and domain name registration identities); *America Online,* 2000 WL 1210372, at \*8, *rev'd on other grounds, America Online, Inc. v. Anonymous Publicly Traded Co.,* 261 Va. 350, 542 S.E.2d 377 (2001); *Dendrite,* 775 A.2d at 760; (2) specificity of the discovery request, *seescandy.com,* 185 F.R.D. at 578, 580; *Dendrite,* 775 A.2d at 760; (3) the absence of alternative means to obtain the subpoenaed information, *see seescandy.com,* 185 F.R.D. at 579; (4) a central need for the subpoenaed information to advance the claim, *America Online,* 2000 WL 1210372, at \*8; *Dendrite,* 775 A.2d at 760–61; and (5) the party's expectation of privacy, *[In re] Verizon,* 257 F.Supp.2d [244] at 260–61, 267–68 [D.D.C. 2003], rev'd on other grounds, *Recording Indus. Ass'n of America, Inc. v. Verizon Internet Servs., Inc.,* 351 F.3d 1229 (D.C.Cir. 2003). As set forth below, each of these factors supports disclosure of defendants' identities.

*Id.* at 564–65. In determining that Sony had made a prima facie claim for copyright infringement, the court, applying the elements of that tort, noted that Sony had provided with their complaint: (1) "a partial list of the sound recordings the rights to which defendants ha[d] allegedly infringed"; (2) "a valid Certificate of Copyright Registration" for each of the recordings; (3) allegations that Sony was granted the "exclusive rights to reproduce and distribute to the public [each of] the copyrighted recordings." *Id.* at 565.

After reviewing the standards employed by many of our sister courts, we believe that a test requiring notice and opportunity to be heard, coupled with a showing of a prima facie case and the application of a balancing test—such as the standard set forth in *Dendrite,* 775 A.2d at 760–61—most appropriately balances a speaker's constitutional right to anonymous Internet speech with a plaintiff's right to seek judicial redress from defamatory remarks. In determining that a prima facie showing of defamation is the appropriate threshold, we are cognizant that setting too low a threshold would limit free speech on the Internet, while setting too high a threshold could unjustifiably inhibit a plaintiff with a merito-

rious defamation claim from pursuit of that cause of action. The lower "good faith basis" or "motion to dismiss" thresholds, articulated by our sister courts in *AOL,* 52 Va. Cir. at 37, and *seescandy.com,* 185 F.R.D. at 579, would inhibit the use of the Internet as a marketplace of ideas, where boundaries for participation in public discourse melt away,[22] and anyone with access to a computer can speak to an audience "larger and more diverse than any [of] the Framers could have imagined." *ACLU v. Reno,* 31 F.Supp.2d 473, 476 (E.D.Pa.1999). With the Internet, users can bypass commercial publishers and editors "to speak to one another across the boundaries of divergent cultures," Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and* Hustler *Magazine v. Falwell,* 103 Harv. L.Rev. 601, 634 (1990), and thereby "forge consensus on issues of public concern." *Lidsky, supra,* at 894–95. These concepts, not theoretical but practical, promote public discourse and must be guaranteed the protection of the First Amendment.

Setting the bar too high, on the other hand, to require plaintiffs to meet a summary judgment standard, "that there is no genuine dispute of material fact and that the party is entitled to judgment as a matter of law,"[23] would undermine

---

**22.** Commentators have noted that traditional communication media often require, as a prerequisite to participation, specialized access or financial resources that are not always available to those seeking to reach a larger audience. *See* Lyrissa Barnett Lidsky, *Silencing John Doe: Defamation & Disclosure in Cyberspace,* 49 Duke L.J. 855, 893–95 & n. 204 (2000).

**23.** Rules governing a motion for summary judgment and entry of a summary judgment are set forth in Maryland Rule 2–501:

(a) **Motion.** Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit if it is (1) filed before the day on which the adverse party's initial pleading or motion is filed or (2) based on facts not contained in the record.
* * *
(f) **Entry of judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is

personal accountability and the search for truth, by requiring claimants to essentially prove their case before even knowing who the commentator was.

 Thus, when a trial court is confronted with a defamation action in which anonymous speakers or pseudonyms are involved, it should, (1) require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure, including posting a message of notification of the identity discovery request on the message board; (2) withhold action to afford the anonymous posters a reasonable opportunity to file and serve opposition to the application; (3) require the plaintiff to identify and set forth the exact statements purportedly made by each anonymous poster, alleged to constitute actionable speech; (4) determine whether the complaint has set forth a prima facie defamation per se or per quod action against the anonymous posters; and (5), if all else is satisfied, balance the anonymous poster's First Amendment right of free speech against the *strength* of the *prima facie* case of defamation presented by the plaintiff and the necessity for disclosure of the anonymous defendant's identity, prior to ordering disclosure. *Dendrite*, 775 A.2d at 760–61.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO GRANT THE PROTECTIVE ORDER/MOTION TO QUASH. COSTS IN THIS COURT TO BE PAID BY APPELLEE.**

no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. By order pursuant to Rule 2–602(b), the court may direct entry of judgment (1) for or against one or more but less than all of the parties to the action, (2) upon one or more but less than all of the claims presented by a party to the action, or (3) for some but less than all of the amount requested when the claim for relief is for money only and the court reserves disposition of the balance of the amount requested. If the judgment is entered against a party in default for failure to appear in the action, the clerk promptly shall send a copy of the judgment to that party at the party's last known address appearing in the court file.

ADKINS, J. Concurring.

I join in the result, and the well-penned opinion of the majority, except as set forth below. I agree with the first three elements of the majority's standard, which, in short, requires (1) reasonable efforts to notify, (2) withholding action to allow reasonable opportunity to oppose subpoena, and (3) that the plaintiff identify the alleged defamatory speech.

Further, I agree with the majority's fourth element, although I would offer slightly more explanation of what is sufficient to "set forth a prima facie defamation" action in the context of filing a complaint. Specifically, the majority is not clear whether or not a plaintiff must make this *prima facie* showing by an affidavit, deposition, or other statement under oath,[1] or whether mere allegations of fact are sufficient. While either of these procedures may prove workable, the Bar and the Bench would be better served if the majority would clarify this point.

I respectfully disagree, however, with the majority's inclusion of the fifth element, the balancing test. In reaching my decision, I am mindful of the features of Internet dialogue that increase the potential for damage to persons who are the subject of these communications:

> [T]he relative anonymity afforded by the Internet forum promotes a looser, more relaxed communication style. Users are able to engage freely in informal debate and criticism, leading many to substitute gossip for accurate reporting and often to adopt a provocative, even combative tone. As one commentator has observed, online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas:
>
> > Hyperbole and exaggeration are common, and 'venting' is at least as common as careful and considered argumentation. The fact that many Internet speakers employ online pseudonyms tends to heighten this sense that

---

**1.** If a statement under oath is required, it should be limited to facts that are accessible to the plaintiff.

'anything goes,' and some commentators have likened cyberspace to a frontier society free from the conventions and constraints that limit discourse in the real world.

*Krinsky v. Doe 6,* 159 Cal.App.4th 1154, 72 Cal.Rptr.3d 231, 237–38 (2008)(quoting Lyrissa B. Lidsky, *Silencing John Doe: Defamation and Discourse in Cyberspace,* 49 Duke L.J. 855, 863 (2000)). This "anything goes" mind set, coupled with the virtually unlimited circulation available to bloggers at minimal cost, heightens the danger of injury to the subject of the communication from false or exaggerated statements. I would venture to guess that on the Internet, defamation occurs more frequently and is broadcast to more people than via any other medium, past or present. With this in mind, I am reluctant to set additional barriers to a person seeking to assert a legitimate cause of action to remedy the damage inflicted by a defamatory Internet communication.

In my view, the balancing test is unnecessary and needlessly complicated. *See Doe v. Cahill,* 884 A.2d 451, 461 (Del. 2005)("The summary judgment test is itself the balance. The [balancing test] adds no protection above and beyond that of the summary judgment test and needlessly complicates the analysis.") Although the Delaware court spoke in terms of the summary judgment test, the point is also applicable in a motion to dismiss context.

A quick review of the substantive law of defamation bears out this thesis. The common law has a well-developed law of both absolute and qualified privilege and legislative enactments have provided additional categories of privileged communications. The absolute privilege protects certain defendants absolutely from liability for communications made in certain contexts, such as those made in the course of a judicial proceeding, *Reichardt v. Flynn,* 374 Md. 361, 367, 823 A.2d 566, 569 (2003), or communications made by high executive officers that are reasonably related to the officer's duties, *Walker v. D'Alesandro,* 212 Md. 163, 170, 129 A.2d 148, 151–52 (1957).

There are qualified privileges covering a much broader scope of communications. These include, *inter alia,* communications made (1) to law enforcement officers regarding alleged criminal activity, *Caldor, Inc. v. Bowden,* 330 Md. 632, 653–54, 625 A.2d 959, 969 (1993); (2) to protect one's reputation against defamation, *McDermott v. Hughley,* 317 Md. 12, 29, 561 A.2d 1038, 1047 (1989); (3) by or to a credit reporting service, 15 U.S.C. § 1681 h(e) (2006); (4) by an employer in the investigation of suspicious or criminal employee conduct, *McDermott,* 317 Md. at 28–29, 561 A.2d at 1046–47; (5) by an employer or prior employer to a prospective employer concerning an employee's job performance, Maryland Code (1974, 2006 Repl.Vol., 2008 Supp.), § 5–423 of the Courts and Judicial Proceedings Article ("CJP"); (6) to someone who shares a common interest, *Gohari v. Darvish,* 363 Md. 42, 57–58, 767 A.2d 321, 329 (2001); and (7) in the context of professional peer review in the health care field, CJP §§ 5–637 and 5–638.

Qualified privileges protect the speaker from liability for defamation, but generally are lost when the speaker acts with malice or intent to harm. *See, e.g., Di Blasio v. Kolodner,* 233 Md. 512, 522, 197 A.2d 245, 250 (1964)("An absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused.").

Another important doctrine of defamation law rests on the First Amendment, and requires that any public official who sues for defamation must surmount the more difficult burden of establishing that the defendant acted with what is known as " 'Constitutional malice[.]' " *See, e.g., Smith v. Danielczyk,* 400 Md. 98, 114–15, 928 A.2d 795, 805 (2007)(stating that public officials must prove by clear and convincing evidence that the defendant "either knew their statements were false or acted with reckless disregard of whether they were true or false").

These and other doctrines are all substantive rules of defamation that were developed as part of the common law, including application of the First Amendment principles, and legislative enactment. Each of these embraced a judicial balancing of the interests of the defendant and society in free and unfettered communication against the interests of the plaintiff in a good reputation.

The balancing test adopted by the majority accords to a trial court the authority to decide that a plaintiff's cause of action for defamation shall not go forward, even though it meets, on a *prima facie* basis, all of the common law requirements, because the court has decided that the defendant's interests are greater, on balance, than the plaintiff's. But the majority grants judges that discretion, without specifying how the interests that trial courts are to balance differ from the interests that are already balanced in developing the substantive law of defamation. I fear that the majority decision invites the lower courts to apply, on an *ad hoc* basis, a "superlaw" of Internet defamation that can trump the well-established defamation law. This newly granted balancing authority, ironically, may defeat the balance developed through the judicially developed defamation law when judges refuse to require disclosure of the identity of putative defendants. In doing so, it may become an obstacle to pursuit of legitimate causes of action.

Judges MURPHY and BARBERA authorize me to state that they join this concurring opinion.